UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KENNETH POWELL | : | CIVIL NO. 3:02CV1638 (HBF) |
| V. | : | |
| JOHN ARMSTRONG, ET AL. | : | OCTOBER 10, 2003 |

## DEFENDANTS' PROPOSED FINDINGS OF FACTS

1. On November 20, 1998, plaintiff was sentenced in five different criminal dockets of Larceny third degree, (C.G.S. §53a-123), three counts of violation of probation, (C.G.S. §53a-32) and one count of prostitution, (C.G.S. §53a-82) and ordered to serve concurrent sentences for a total effective sentence of three years. See Mittimuses, Exhibit G; Powell cross exam.

2. Mr. Powell also had two felony drug convictions, one for possession of narcotics and one for sales of narcotics. Powell cross exam.

3. Mr. Powell has been convicted of Larceny 6th degree on twelve different occasions. Powell cross exam.

4. Mr. Powell admitted on cross examination that he was very familiar with all aspects of rules, procedures and regulations of the Department of Correction, as he had been incarcerated, as he said, at least "one or two times" over the years. Powell cross exam.

5. Mr. Powell knew that his fake hair extensions were contraband; indeed, he testified he was "well aware of that." Powell cross exam.

6. Bridgeport Correctional Center (CC) allowed Mr. Powell to remain in the correctional center with his fake hair extensions from November 20, 1998 to his transfer to Walker Reception

and Special Management Unit (RSMU) on November 24, 1998. Powell direct;

7.  The Court finds that Mr. Powell's testimony in material respects is not credible. It is not credible that Mr. Powell was allowed to wear high heel women's shoes at the Bridgeport CC as he testified. Powell direct; Heller direct. See Property matrix, Exh. 5, Q.

8.  Mr. Heller was working at Walker RSMU on November 24, 1998. Heller direct.

9.  Heller was assigned to the second shift and was a property officer working in the property room if the Admitting and Processing (A&P) area of Walker RSMU. Heller direct. Exh L.

10. Heller was processing inmate property in the Property Cage when he heard loud voices coming from the Nurse's interview room, IP 22, where Nurse Irene Carlon was conducting medical intake interviews. Heller direct; Carlon direct; Exh L. Carlon called Heller into the room. Exh A. p. 08.

11. Correction Officer Donald Figiela was working in the A & P area and also responded to the loud voices coming from the nurse's interview room.

12. C.O. Figiela gave Powell a direct order to remove his contraband hair braids and Powell refused in a threatening manner, stating he was not going to remove his hair braids and that the correction officers were not going to remove them either. Exh A. p. 22.

13. Nurse Carlon noted in her medical chart note that Powell was argumentative and belligerent, refusing to remove his fake hair braids and his contact lenses. She called the shift supervisor, Captain Cusimano, who directed Lt. Linares to respond to the nurse's office. Exh. A. p. 02; Exh B, p. 01, 06; Exh. H, p. 330

2

14. Lt. Edgardo Linares, responded to a radio call and arrived in the Nurse's room, and was apprised of the situation by his staff. Carlon, Heller, Linares testimony.

15. Lt. Linares gave plaintiff a direct order to remove his fake hair extensions, and Powell responded that he was not going to and told Lt. Linares to do what he had to do. Linares testimony.

16. Lt. Linares ordered C.O. Figiela and Heller to escort Powell to segregation to remove Powell from the small office where the nurse had to do intakes. Linares cross exam.

17. Lt. Linares was concerned that Powell's disturbance would agitate the fifteen or more inmates who were in the holding cell just a short distance from the nurse's office. Linares cross exam. Exh. A. p. 04

18. Heller was concerned for the safety of Nurse Carlon. Heller testimony.

19. Powell was assisted out of the chair by Figiela and Heller who held plaintiff in a wrist elbow escort hold, one officer on each side of plaintiff. Heller and Linares testimony. See also Exh A. pp. 04, 08, 18, 20.

20. This was a routine escort, and it was conducted pursuant to normal institutional procedure, in accordance with standard escort techniques taught at the DOC training academy. Heller and Linares testimony.

21. Upon arrival in the segregation foyer, plaintiff began passively resisting the escort, refusing to move his own feet, and actively struggling to escape the grasp of the officers. Heller and Linares testimony. Exh A. pp. 04, 07,08,09.10 (Siwicki's incident report describes Powell as physically combative).

22. Plaintiff was ordered to face the wall, and he began to vigorously resist the officer's escort, struggling to get free, twisting his head and body. Linares testimony.

23. Lt. Linares instructed the correctional officers to escort Mr. Powell to the prone position, and Powell was guided down by Figiela, Heller, who had his upper extremities, Peterson, who maintained control of the upper torso, and Siwicki, who maintained control of plaintiff's lower torso while escorting Powell to the prone. Exh. A. pp. 16, 17, 18, 20, 21.

24. Plaintiff was escorted to the prone position for control and safety, for the safety of everyone, including plaintiff, and was handcuffed. Linares testimony.

25. The Court finds that plaintiff failed to produce even a scintilla of credible evidence that defendant Linares acted for any other motive other than to maintain safety, control and order in the Walker RSMU on November 24, 1998. Linares and Cusimano testimony; Exh A.

26. Powell's face was not in any way injured. Exh J; Linares testimony. Cusimano testimony; Carlon testimony; Exh B, 01, 06.

27. Powell's head did not hit the wall or the floor and there was no evidence or objective findings of any bruises. Exh B, p. 01, 06; Cusimano and Linares testimony; Carlon testimony.

28. Powell was placed in a chair in the segregation foyer, and Nurse Carlon was summoned to cut out Powell's artificial hair braids. Cusimano testimony; Exh A, p. 05,06; Exh J

29. Nurse Carlon carefully separated the braids, and gently cut them with a medical trauma shears. Exh. J

30. Contrary to Powell's statement, Exh. X, the video, Exh J, and the photograph of

4

plaintiff's head, Exh C, clearly demonstrate that plaintiff had no bald spots, but rather was left with approximately two inches of natural hair. Cusimano testimony.

31. The Court finds that Powell's allegation that he was left with numerous bald patches is completely unsubstantiated. Exh C.

32. Mr. Powell's testimony is also contradicted by the facts as evidenced in the video in several material respects, including Powell's claim that he was first ordered to remove his contact lenses, and second, he was given a hair cut. Powell testimony; Exh x, Exh J.

33. Powell claimed in the video that without contact lenses, "he couldn't see a thing without them," which is squarely contradicted by plaintiff's medical record which shows 20/20 in Powell's left eye and 20/40(-)(1) in Powell's right eye. Exh. B. p.09;

34. The video contradicts Powell's claim that Nurse Carlon roughly grabbed and pulled plaintiff's hair and cut it at the base of his scalp. Exh X; Powell testimony; Exh J.; Exh C.

35. Mr. Powell is seated calmly in the chair in the video, and he does not appear to have just been brutally beaten by four correction officers. Exh J. He is not breathing heavily nor is he stating for the video camera, as he alleged, that he is being treated unjustly because of his sexual orientation. Exh X; Exh J.

36. Importantly, Mr. Powell's claims that he was the subject of numerous vulgar homophobic epithets, allegedly stated out loud while plaintiff was on video and was being strip searched, is totally false. Exh J.

37. The Court finds that the defendants did not make any homophobic or unprofessional remarks to plaintiff, but instead, at all times acted in a professional manner, within the scope of

5

their employment.

38. The Court also finds that the defendants acted to restore control, order and safety, and that the number of officers involved in the incident were reasonably necessary to maintain control and safely escort plaintiff to the prone position.

39. The Department of Correction has a directive which authorizes the use of force to protect a person from an immediate threat. Exh N, p. 03, ¶5.A

40. The Court finds that defendants escorted plaintiff to the prone because they reasonably believed that plaintiff posed an immediate threat to Correction Officers Heller and Figiela, when plaintiff was struggling to get his arms free from the escort.

41. The Court finds that the use of force was necessary, and was reasonably related to legitimate enological objectives. Cusimano, Linares testimony

42. The removal of plaintiff's contraband hair extensions was necessary to prevent the introduction of contraband into the segregation unit, and eliminated the danger posed by the braids, which could be used to secrete needle, razors or a handcuff key, and could easily assist the plaintiff in changing his identity. Cusimano, DeRota testimony.

43. The braids were made of a strong, synthetic material which would not break, and there was concern they could be removed and woven into a rope to choke someone or to assist in a suicide attempt. Powell, Vaughn, DeRota, Cusimano testimony.

44. There was no evidence that plaintiff was treated in a discriminatory manner simply because he was a homosexual.

45. The removal of plaintiff's artificial hair extensions was undertaken solely for legitimate penological reasons related to preventing escape, and protecting inmate and facility safety.

46. Plaintiff was strip searched in a routine, professional manner in accordance with DOC policy. See Exhibit O, A.D. 6.7; Exh J.

47. Plaintiff was escorted to segregation cell S-09 and was seen by Nurse Carlon in a matter of minutes.

48. Nurse Carlon performed a complete head to toe examination of plaintiff. Exh J.

49. Nurse Carlon was a licensed and practicing nurse for 45 years, and was also certified as an Emergency Medical Technician (EMT). Carlon testimony

50. Nurse Carlon found no bruises on plaintiff and so indicated in her medical incident report and medical chart note. Exh. B 01, 06.

51. Plaintiff was seen by medical and/or mental health staff on November 24, 25, 27, 30, and twice on December 1, 1998, once by Dr. Heller. Exh B 01-06.

52. There is no documentation anywhere in plaintiff's medical chart which corroborates plaintiff's claim of injury. Powell cross exam; Exh. H. Exh B 10-06.

53. On November 30, 1998 plaintiff was given routine blood laboratory work, as part of his intake physical, including a urine sample. See Exh H, pp. 92-95. This medical record completely refutes plaintiff's claim that he went "untreated."

54. Powell's assertion at trial that he was suicidal is completely contradicted by the contemporaneous notes taken by mental heath staff, which state unequivocally that plaintiff was

7


not suicidal. Exh 27, p. 3; Exh H 328, 329; Exh B 04, 05.

55. Even Mr. Powell, himself testified that he received satisfactory mental health care. Powell testimony; Exh B. 04-05.

56. There was no evidence offered at trial that Nurse Carlon had any duties or responsibility for providing plaintiff with treatment for an alleged "gender identity disorder."

57. The only evidence at trial as to Nurse Carlon's duties was that she was assigned to perform intake medical interviews and intake physical examinations, as well as respond when needed to segregation, for example for medication administration or upon being summoned by the unit officer.. See Seg Logbooks, Exh K, at p. 17 (log p. 287).

58. The logbook pages demonstrate prompt, indeed, attentive responses by medical and mental health staff, who responded to segregation when called by the segregation officers. Exh. K.

59. The Court finds that there was no evidence of deliberate indifference to serious medical or mental health needs of the plaintiff.

60. Plaintiff had no visible injuries and all examinations were within normal limits. Id.

61. The defendants reasonably believed that they were authorized to use force under the circumstances of this case.

62. A supervisor, Lt. Linares was on the scene, and sufficient staff were in place to assure the safety of plaintiff when escorted to the prone position.

63. Sufficient staff were present so that chemical agents did not have to be used.

64.     The only force used was the reasonable application of a hand hold (wrist-elbow) escort position and the escort of plaintiff to the prone position, standard security procedures taught in the DOC training academy, provided for by DOC directives and policies.

65.     Plaintiff was not escorted to the prone until after he began resisting the escort, twisting his body and head, and attempting to pull his hands away when he was asked to face the wall, and his hands were placed on the wall outside segregation.

66.     The force used was reasonable and was for legitimate penological objectives, to maintain safety for the staff and plaintiff as well, and to maintain order in the Walker facility.

67.     Plaintiff had no appreciable injury and was provided prompt, appropriate care.

68.     There is no credible evidence of any discrimination against plaintiff because he is homosexual.

DEFENDANTS
John Armstrong, et. al

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5450
E-Mail: steven.strom@po.state.ct.us
Federal Bar #ct~~85102~~ 01211

9

## CERTIFICATION

I hereby certify pursuant to Rule 5 F.R.C.P that a copy of the foregoing was mailed this 10th day of ~~September~~ October 2003 to:

Jennifer Vickery, Esq.
Alan Rosner, Esq.
1115 Main Street
Bridgeport, CT 06604

_____
Steven R. Strom
Assistant Attorney General