FILED

2003 OCT 14 A 10: 17

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KENNETH POWELL | : | CIVIL NO. 3:00CV1638 (HBF) |
| VS. | : | |
| JOHN CUSIMANO, ET AL. | : | OCTOBER 10, 2003 |

## DEFENDANTS' POST-TRIAL BRIEF

On September 16, 2003, the second day of trial in this case, Kenneth Powell, the plaintiff ("Powell") remained seated at counsel table, and covered his eyes while Exhibit J, the video tape of the events of November 24, 1998, was played in Court. Powell did not want to see the truth, nor did he want to verify or corroborate any of the outrageous allegations he had made. In fact, on September 15, 2003, Powell admitted on cross-examination that he had never watched Exhibit J, the video, despite the fact that he complained to the Court during discovery that the copies he had been provided were allegedly "blank." Defendants were compelled to provide plaintiff with three different copies, and he didn't even bother to watch the video.

### I. PLAINTIFF'S TESTIMONY WAS NOT CREDIBLE

It is remarkable that Powell refused to watch the video, the single most accurate record of what happened at Walker Reception and Special Management Unit ("WRSMU") on November 24, 1998. Indeed, Powell's decision not to watch the video is indicative of his cavalier attitude toward the true facts of this case, and his lack of interest in determining an accurate accounting of what actually happened at WRSMU on November 24, 1998.

The video completely refutes plaintiff's claim that defendants verbally abused him while he was seated in the chair when Nurse Carlon cut his contraband fake hair extensions out. The video completely repudiates plaintiff's false claims that defendants verbally abused plaintiff during the strip search.

Plaintiff repeatedly stated that he "stood by his statement," defendants' Exhibit X, despite the fact that the statement was materially false. Plaintiff could have attempted to verify the accuracy of his statement, but he decided not to do so. Instead, plaintiff chose not to watch the video, and he remained at counsel table, covering his eyes, blinding himself from the truth of what actually happened.

The video, Exhibit J, also refutes plaintiff's allegation that he faced the camera and explained how he was allegedly being "discriminated against" because he was a homosexual. Exhibit J further proves plaintiff had no injury to his face, nor did he claim to have a facial injury.[1] The video contradicts plaintiff's repeated assertion, under oath, that his contact lenses were removed first, and only thereafter were the contraband hair extensions removed. Exhibit J also demonstrates that Nurse Carlon was gentle when she carefully cut out the hair extensions, and that plaintiff's statement that she grabbed his hair roughly, cutting out the hair extensions at the scalp, was patently false.

Both Lieutenant Linares and Captain Cusimano testified that plaintiff had no visible injuries, had no swelling in his knee and had no "golf ball sized knot" in his head. Lieutenant

Linares photographed plaintiff and defendants' Exhibit C completely refutes plaintiff's allegation that he had numerous large-size bald patches on his scalp. See Exhibit X. Nurse Carlon, a registered nurse for 45 years with EMT certification, did a complete head-to-toe examination of plaintiff and found no bruises, nor any injuries whatsoever. See Exhibit A, p.25; B, pp. 1, 6. Indeed, when Nurse Carlon cut out the contraband hair extensions, Powell made no grimaces, nor voiced any complaint of pain, all the while Nurse Carlon was carefully lifting, separating and cutting out the extensions. Nurse Carlon had ample opportunity to feel plaintiff's skull. There was no claim of a golf ball-sized lump on Powell's head nor any indication of pain during the filmed haircut. Clearly, the inconsistent claim of head pain, several minutes later, while the camera video taped the in-cell medical examination, demonstrates that plaintiff was feigning his injury, and was attempting to buttress a fraudulent lawsuit he was then beginning to plan to file. See Sealey v. Giltner, 197 F.3rd 578, 586 (2d Cir 1999). Plaintiff's testimony is not credible and is not corroborated, and thus, plaintiff failed to meet his burden of proof. In Sealey, Judge Newman, stated, in relevant part:

> Triers of fact, whether juries or judges, have the obligation to assess the credibility of witnesses, including parties, and a plaintiff's testimony in support of his own claim, if credited and persuasive, will normally suffice. This does not entitle a plaintiff to win merely by testifying, as the Magistrate Judge apprehended, but only by presenting testimony that the trier concludes is both credible and, along with other evidence, if any, sufficiently persuasive to satisfy the plaintiff's burden of proof by the requisite preponderance of the evidence.

---

[1] At trial and in his Amended Complaint, para. 22, plaintiff claimed his face was forcefully pushed into the wall. Linares denied this claim when he testified, and Powell claimed no

3

1. **Plaintiff's Medical Interview Was Private, Confidential And Required, In Part, By <u>Doe v. Meachum</u>**

In plaintiff's post-trial brief at pp. 5-6, para. 13, plaintiff incorrectly asserts that the answer to the question "Have you had sex with someone of your own sex?" was disclosed to Heller and Figiela. Plaintiff's assertion and his characterization of the facts is totally mistaken.

First, Nurse Carlon began the medical intake in a private, confidential setting, asking questions on a routine health services form, which was in plaintiff's chart. This intake form was devised and revised by a panel of three infectious disease specialists, in the context of settling <u>Doe v. Meachum</u>, H-88-562 (JGM) (approved by Judge Cabranes, Dec. 6, 1990) and is required to be filled out by the Consent Decree in <u>Doe v. Meachum</u>. <u>See</u> copy attached, pp. 7-8, paras. 11, 12. Nurse Carlon did not make up the form on her own, nor is she liable for "homosexual harassment" for asking such questions. Indeed, the requirements of the <u>Doe v. Meachum</u> Consent Decree are a complete defense to any and all claims related to the medical intake form.

Indeed, plaintiff's demonstrable annoyance with being asked such questions was totally and dramatically contrived for the purpose of trial. As defendants' Exhibit H, plaintiff's medical record, at 238-258, amply demonstrates, plaintiff was asked the questions on the medical intake form numerous times at various different Department of Correction facilities. Plaintiff never once filed a homosexual harassment complaint or grievance about the questions, and generally cooperated, prior to the November 24, 1988 date at issue, with completing the questionnaire.

---

injury to his face at any time.

There was no evidence that any medical information in plaintiff's medical chart was disclosed to any non-medical defendant.

Plaintiff's various of so-called "facts" in his brief, that Figiela, Heller, Sawicki and Peterson allegedly stood in the doorway at listened to the interview, is not based on any evidence in the record and was refuted by Mr. Heller's testimony. Heller testified that he and Figiela only responded after hearing loud voices coming from the nurse's room and in response to a call from Nurse Carlon. This call was made after Nurse Carlon had attempted verbal intervention with plaintiff, attempting to explain to Powell he must remove the contraband hair extensions. The more Nurse Carlon attempted to talk to Powell, the more agitated and belligerent Powell became. Thus, plaintiff's assertion at p.12 of his brief that verbal means were not used by defendants, is completely incorrect. Nurse Carlon certainly tried to verbally persuade Powell to comply, Correctional Officer Figiela had given a direct verbal order, and thus no further verbal coaxing was necessary when Lieutenant Linares arrived.

### 2. The Decision Not To Handcuff Plaintiff Does Not Implicate Any Constitutional Rights

Correctional Officer Heller testified that he was concerned for Nurse Carlon's safety. Indeed, although she testified she was not afraid, Nurse Carlon was concerned enough by plaintiff's belligerent attitude, that she picked up the phone and called the Captain. Nurse Carlon also became concerned enough to call the correction officers who were in the A&P area. See Exhibit A, p.10; B, p.6. The decision by Lieutenant Linares to quickly remove plaintiff from the A&P area was solely based on his concern for maintaining institutional order and security,

5

insofar as there were approximately 15 inmates in the holding cell who potentially could become agitated and create a significant disturbance, being provoked by plaintiff's loud voice and belligerent argument with the correction officers. Further, just as there was an altercation in the segregation foyer initiated by plaintiff's physical resistance, an altercation in the nurse's office could have resulted in serious injury to Nurse Carlon, an elderly woman who obviously weighed less than 100 pounds. In order to keep her safe, and remove the recalcitrant plaintiff as quickly as possible, Lieutenant Linares directed Figiela and Heller to escort plaintiff by the wrist and elbow, to avoid escalating the situation in the security sensitive A&P area.

Captain Cusimano testified that Lieutenant Linares, as a supervisor, had discretion to make that snap judgment, as Linares was the ranking supervisor on the scene. The memo from Major Sparks, who conducted a security audit of the incident after the fact, merely reminded Captain Cusimano that the normal, routine procedure is to use handcuffs while escorting an inmate to segregation. However, the failure to follow a state prison security procedure does not in any manner rise to the level of a violation of constitutional rights. It is well-established that state procedures do not create federally enforceable rights. Cofone v. Manson, 594 F.2d 934, 938 (2d Cir. 1979) and Bolden v. Alston, 810 F.2d 353, 358 (2d Cir. 1987).

Plaintiff appears to place some reliance on the fact that he weighed only 140 pounds, plaintiff's brief at 14; however, both Cusimano and Linares testified without refutation whatsoever, that some of the most dangerous and violent inmates they have dealt with are short, slim or slender and weigh very little. It is impossible to predict simply based on sight, body type or body weight which inmate might have a violent outburst or explosive temper.

6

### 3. The Tape Ran Continuously, According To Policy, Until Plaintiff Was In His Cell

Plaintiff's attempt to discredit the video is almost entirely based on a meaningless interruption of three minutes after plaintiff was in his cell, and prior to commencing the medical exam. This break was explained satisfactorily by the Captain, as it was unnecessary to aim the camera at a closed cell door while the plaintiff was secured in S-09 cell. There was no evidence the tape was "staged" and plaintiff's assertion in his brief that the verbal harassment occurred prior to the video being turned on is contradicted by Mr. Heller, plaintiff's own sworn testimony and Exhibit X.

### 4. The Tape Was Reviewed

Plaintiff incorrectly claims in his brief that the videotape was not reviewed. Both Warden Wolff and Complex Warden Huckabey reviewed the tape. Upon review of the tape, it was a routine security procedure and a routine reporting procedure for supervisors such as the Complex Warden, Warden and Major to request additional supplemental incident reports. Cusimano testimony. Cusimano did not have to see the video again because he clearly remembered the precise words he used when Powell was strip searched. He also knew he used no other questionable vocabulary. Cusimano's report answers the question as to whether "unprofessional language" was used. Since no other vulgarities were spoken by either Cusimano or any of the defendants, Cusimano commented truthfully in his report why he used the terms that he chose. See Exhibit A at 5-6.

### 5. The Use Of Force Was Unanticipated And Unforeseeable

Plaintiff repeatedly misconstrues or misunderstands DOC policies in his brief. At trial, plaintiff's counsel was unable to distinguish between a planned use of force, such as a cell extraction where it is anticipated that four officers will enter a cell and forcibly remove a recalcitrant inmate, and a spontaneous use of force, as occurred with plaintiff, when he suddenly began to struggle with Heller and Figiela upon entering the segregation foyer. Both Linares and Cusimano correctly explained the difference, but plaintiff's post-trial brief reveals that plaintiff remains confused about the policy.

The defendants' decision to tape the haircut conducted by Nurse Carlon was a planned use of force, because it was known that physical contact would be made with plaintiff and that his contraband hair extensions would be cut out by the Nurse, arguably a use of "physical force." Indeed, Nurse Carlon filled out a "Use of Force" form. Exhibit A at 19.

### II. PLAINTIFF'S RELIANCE ON DURHAM V. NU'MAN IS MISPLACED

In his brief, and at trial, plaintiff asserted that the nurse had a duty to intervene to stop a beating citing Durham v. Nu'man, 97 F.3d 862 (6th Cir. 1996). In that case the nurse stood idly by and watched a ten minute brutal beating on a video display and did nothing. Here, there was no evidence that Nurse Carlon was aware, or even present, when plaintiff was escorted to the prone position. There was no credible evidence of any beating, nor was there evidence that Nurse Carlon had the ability to intervene, to override a correctional captain, who was the shift commander. The facts of the Durham decision are decidedly different from the facts of this case. Thus, plaintiff's reliance on Durham is totally misplaced.

With regard to the analysis of plaintiff's case, no useful purpose is served by repeating arguments that have been already briefed in connection with the motion to dismiss or in the defendants' pre-trial memorandum, and thus, the defendants file a short accompanying reply brief and proposed findings of fact.

## CONCLUSION

For all the foregoing reasons, plaintiff's so-called "facts' should be rejected, and the court should adopt pursuant to Rule 52 Fed. R. Civ. P. the defendants' proposed findings of fact as the findings of the Court. Further, for the reasons stated above and during the defendants' Rule 52 oral argument, as well as the briefs and memoranda previously on file with the court, Judgment should enter for the defendants.

DEFENDANTS
John Cusimano, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Steven R. Strom
Assistant Attorney General
Federal Bar No. ct01211
110 Sherman Street
Hartford, CT  06105
E-Mail: steven.strom@po.state.ct.us
Tel: (860) 808-5450
Fax: (860) 808-5591

9

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following on this 10th day of October 2003:

Jennifer Vickery
Law Offices of Alan Rosner
1115 Main Street, Suite 415
Bridgeport, CT 06604

Steven R. Strom
Assistant Attorney General