UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 OCT 14 A 10: 17

| | | |
|---|---|---|
| KENNETH POWELL | : | 3:00CV1638(HBF) |
| v. | : | |
| JOHN ARMSTRONG, ET AL, | : | OCTOBER 8, 2003 |

## DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF AND STATEMENT OF "FACTS" THEREIN

Introduction

This is a prisoner civil rights action seeking money damages from the named defendants, John Cusimano, other named DOC or UCHC staff who were working at Walker RSMU on November 24, 1998, the date that plaintiff was admitted to Walker and refused to cooperate with direct orders given to him to remove his contraband fake hair extensions. On November 20, 1998 plaintiff was convicted of three counts violation of probation, prostitution, and larceny second degree in violation of C.G.S. §53a-123. Plaintiff also admitted on cross examination to two felony drug convictions and twelve convictions for larceny sixth degree, which the court admitted as they go to plaintiff's lack of credibility and lack of trustworthiness. Plaintiff, in his post-trial brief, section II, asserts numerous so-called "facts" without any evidence in the record and without any reference to any witness or documentary exhibit. In an abundance of caution, the defendants respectfully submit this memorandum in response thereto to point out some of the most salient misstatements made by plaintiff.

COUNTER STATEMENT OF FACTS AND RESPONSE TO PLAINTIFF'S "FACTS"

1. In paragraph 1, plaintiff omits other felony convictions and convictions for dishonesty as listed above. In addition, plaintiff admitted he was arrested on 26 different occasions, and was

well versed in all of the rules of the Department of Correction because he had been incarcerated on a number of different occasions.

2. In paragraph 2 plaintiff asserts that throughout his adult life he dressed and groomed himself as a woman. There is no constitutional right for a male convicted felon to dress and groom himself as a woman while being incarcerated in a correctional institution for adult male felons. Plaintiff point to no such authority and to the extent he claims a violation based on this purported right, his action must be dismissed. Plaintiff was subjected to generally applicable, neutral rules governing the prohibition of contraband, which apply to wigs, and other facial disguises, including contraband artificial hair extensions. There was evidence at trial that women incarcerated at the state's only correctional facility for women, York CI in Niantic, Connecticut, are similarly prohibited from wearing any artificial hair extensions. Heller testimony; Exhibit 10. Thus, plaintiff was not singled out or discriminated against. He was required to remove contraband fake hair, just as an female inmate in similar circumstance would be required to do.

3. Plaintiff now admits in his post-trial brief that he only has a "mild vision deficit." In the video, plaintiff exclaimed several times, that "these contact lenses are prescriptive and I can't see a thing without them." Again, the defendants did not make up the policy which determined that contact lenses are contraband, it was a directive in a memo from Major Sparks. Exhibit T. That policy was security/health & safety policy in the event pepper spray had to be used in a correctional facility and was implemented for the plaintiff's own health and safety. In any event, the medical record refutes plaintiff's assertion in the video that "he can't see a thing without" his contact lenses.

4. Plaintiff's testimony about his incarceration at Bridgeport CC was totally incredulous, and beyond belief. Although it clearly appears that Bridgeport failed to detect the contraband

2

extensions woven into plaintiff's natural hair, it cannot be believed that plaintiff was allowed to wear high heel shoes while at Bridgeport CC.

5. As to paragraph 5, there is no credible evidence in the record that the defendants were even on duty when the bus arrived from Bridgeport CC. There is no credible evidence in the record that any of the defendants commented on plaintiff's "gender identity." Indeed, the plaintiff's perception of the events in this case make it seem as if the arrival of a cross-dressing homosexual was a rare event. Instead, the evidence was to the contrary. Anyone with any degree of familiarity with men's prisons would recognize that homosexuals are frequently admitted to DOC facilities. Indeed, Correction Officer Heller testified that he had two or more inmate workers assigned to the property room who were homosexuals, and that they were among his best workers. Plaintiff's brief apparently attempts to portray the plaintiff as the center of attention simply because he had long hair extensions, when in fact, he only became the center of attention by virtue of his recalcitrant behavior, and belligerent refusal to remove the contraband fake hair extensions after being asked to do so by Nurse Carlon, and after being given a direct order to do so by Correction Officer Figiela. Plaintiff was not singled out, instead he was treated the same as any other inmate in possession of contraband. He was given a disciplinary report. Plaintiff also disobeyed a direct order, and pleaded guilty. He was sent to segregation on A.D. [Administrative Detention] pending the disposition of his disciplinary reports, not unlike inmate Jenkins. See Exh. K, p. 23 (logbook p. 293).

6. Plaintiff fails to mention that the holding cell also held approximately 15 other inmates, and that the A & P area was an extremely sensitive area in terms of the risks presented by newly arriving inmates who were unknown to the Walker facility. Due to his concern of the

3

proximity of the holding cell, Lt. Linares decided to quickly remove plaintiff from the IP22 medical intake room.

7. Plaintiff's version of the events are not consistent with Correction Officer Heller's testimony, who testified he was in the property cage. Nurse Carlon testified and the Court can take judicial notice that she had a very soft voice. There is no credible evidence that any correctional officer "watched from just inside the doorway" while a confidential medical intake interview was conducted. Indeed, even the plaintiff did not testify that this had occurred. Plaintiff's argument defies common sense. Plaintiff appears to claim that four correctional officers and a lieutenant, who were assigned to different posts, the "shakedown" officer, the "booking" officer and the A & P officer, would leave their posts simply to view a person who had long hair extensions. Plaintiff was not the "star attraction" to warrant such a response from the coorectional officers, who deal with homosexual inmates and inmates with long hair on a daily basis. Correctional officers have seen and dealth with homosexual inmates before, and there was nothing special or new or different about this plaintiff, except that he had contraband fake hair extensions, and then he "copped an attitude" and became vocally hostile and belligerent. It makes far more common sense to infer from the evidence at trial that the correctional officers in the A & P area were called to the scene by Nurse Carlon after the medical intake process was discontinued because of plaintiff's refusal to remove his contact lenses and refusal to comply with instructions from the nurse to remove the contraband.

8. Paragraph 8 plaintiff omits the critical statements he made that his hair was fake, and that he was not going to remove the hair extensions. His primary complaint was that Bridgeport CC had allowed them to remain in, and therefore, according to plaintiff, Walker RSMU was somehow, "estopped" from asking him to remove the contraband hair extensions. DOC policies

4

prohibit contraband. This is a neutral, generally applicable rule, and the defendants are not liable for simply enforcing DOC rules. Indeed, they could be accused of negligent rule enforcement, as perhaps the Bridgeport CC staff could be accused of, if they had looked the other way. It is more likely, however, that Bridgeport never knew the hair was fake and therefore constituted contraband. Plaintiff's hair did not comply with the DOC rule which prohibits contraband. See Exhibit R at p. 08, ¶13 C. Contraband, Class B, Being in possession of unauthorized items. See also Exhibit A, p.22; Exhibit E.

10. Plaintiff admits in paragraph 10 that plaintiff's fake hair extensions were contraband. He also stated in his deposition and on cross examination that he had been aware and knew that the fake hair extensions were contraband. The defendants did not invent or author this DOC administrative directive, but rather the Commissioner did. Plaintiff voluntarily dismissed his action as to the Commissioner. The defendants were acting lawfully within the scope of their employment when they acted to enforce DOC A.D. 9.5 which, in relevant part, prohibits contraband.

11. Insofar as Nurse Carlon had no present recollection at trial, the best evidence of her testimony is her past recollection recorded, in her medical note where she contemporaneously documented that plaintiff was argumentative and belligerent. Plaintiff's attitude and demeanor were confrontational, stating to Lt. Linares that he wasn't f...ing taking out his extensions, and that the lieutenant should do whatever he had to f...ing do to remove them.

12. As to paragraph 12, Mr. Heller's testimony completely refutes the allegation that Figiela was "shouting and using profanity." Clearly Figiela was stating in a loud, clear manner that he was giving Powell a direct order to remove the hair extensions because they were contraband, but Heller testified that no profanity was used by Mr. Figiela.

Case 3:00-cv-01638-HBF   Document 78   Filed 10/14/2003   Page 6 of 15

13. As to paragraph 13, there is no reason that long hair, in and of itself, would notify anyone that the person who chooses to wear his hair long, as a fashion statement, is a "homosexual." If this were true, then one would necessarily have to conclude that the following individuals were "homosexuals" based on their long hair: George Washington, Attorneys Norm Pattis and Ron Kuby, Jesus, Daniel Day Lewis (in Last of the Mohicans), numerous rock stars such as The Allman Broithers, Kiss, ZZ Top, reggae stars such as Bob Marley, Peter Tosh, etc. Plaintiff is the one who is stereotyping here, and there is no credible evidence that anyone did anything to plaintiff based on his sexual orientation, but rather, defendants responded based on plaintiff's threat to the smooth and orderly functioning of the intake unit in the A & P area at Walker. Plaintiff's refusal to respond to a direct order, and refusal to cooperate caused a commotion which affected the other fifteen or so inmates waiting to be processed by the nurse, who were waiting nearby in the holding cell. Linares testimony; see also Exhibit L. In addition, the intake questionnaire was filled out at Bridgeport CC on November 20, 1998, was a part of the confidential medical record, and there is no evidence that it was disclosed to any of the defendants other than, perhaps, Nurse Carlon, who was the only one who had access to the medical chart. See Pl. Exh. 29; See also Doe v. Meachum, Consent Judgment, Civ. No H88-562 (approved by Judge Cabranes after a fairness hearing, Dec. 6, 1990)(copy attached) at pp.7-8, ¶¶ 11, 12.

14. Lt. Linares testified that plaintiff did not begin to explain why he was not able to comply with the order. Instead, Lt. Linares testified that plaintiff adamantly refused to remove the braids and invited the lieutenant to do whatever he had to do to remove the contraband hair extensions because he was not going to remove them.

15. Plaintiff misreads the DOC's policy on use of force, A.D. 6.5. In relevant part, "[n]on-deadly physical force may be used to protect a person from an immediate physical threat." Exh N at p.03, ¶5.A. Lt. Linares testified that when plaintiff began struggling with the escort, resisting placing his hands on the wall, he presented an immediate threat to take a swing and strike either Officer Heller or Officer Figiela, and for the safety of both officers, as well as the plaintiff, the plaintiff was then escorted to the prone position. Lt. Linares and Captain Cusimano both testified that the more officers available to restrain plaintiff by essentially placing their arms around him and holding his arms closely against plaintiff's body, the less likely that he could punch anyone and the more likely that the escort to the prone can be conducted safely, without any injury to staff or plaintiff. In fact, neither the plaintiff nor any officer was injured. In addition, Captain Cusimano and Mr. De Rota both testified as to the sensitive nature of the "little segregation" unit at WRSMU and the fact that no contraband could be permitted in the unit. Due to the high security nature of the unit, and the high profile inmates housed there, the introduction of 70 contraband lengthy hair extensions was determined to jeopardize the safety of individual in this "little segregation" area or "seriously threaten[] the security and control of the area." Plaintiff offered no competent evidence to refute this determination by the Captain.

16. Not only did plaintiff refuse to remove his hair extensions, Linares testimony, but also plaintiff became belligerent and stated in a threatening manner that he was not going to remove his hair braids. Exh A. p. 22 (Disciplinary report of Figiela). Plaintiff pleaded guilty to this misconduct, thereby admitting the statement, and thus, he should be precluded from challenging his admission in this civil action for money damages. Indeed, on cross examination plaintiff readily admitted he knew the fake hair was contraband.

7

17. Lt. Linares testified that this was a normal, routine security escort, and that these routine escorts are never video taped, except when there is knowledge of a planned use of force. Plaintiff was not carried by his elbows with his feet dangling off the ground as set forth in plaintiff's ¶17, but rather he walked, without leg irons, until he arrived at the segregation foyer, when he began to passively resist, refuse to walk and struggle with the escort. Linares testimony, Exh A. The plaintiff clearly was not dragged or choked, and he was not "choking against the neck of his jumpsuit."

18. Plaintiff's paragraph 18 misreads A.D. 6.5, which authorizes use of physical force to maintain order when there is an immediate threat to another person or an area of the facility. See Exh N at p.03, ¶5. A. and 5. D. See also Conn. Gen. Stat. §53a-18(2)(to maintain order and discipline); see also ¶15, *supra*. Plaintiff also misunderstands what a "planned use of force" is. See Exh N. at 13; Cusimano testimony (he planned, in advance, to have the Nurse cut out the contraband, and thus, it was a "planned" use of force).

19. Plaintiff was turned to face the wall and he refused to comply with the escort officers as they placed his hands palms on the wall. Plaintiff began to resist, twisting and turning, attempting to get out of the escort hold, with the immediate threat of striking or spitting at Officer Figiela or Heller. Linares testimony. Accordingly, Linares directed staff to escort plaintiff to the prone. Id. There was no contact at any time by Powell's face to the wall or head to the floor. He was guided down to the floor, not slammed down. Linares testimony.

20. There was no evidence that Cusimano's "purpose" was to "punish, intimidate, and humiliate the plaintiff for his sexual orientation." Cusimano is the only witness competent to testify as to his reasons for electing to do what he did, and his testimony that it was to protect the integrity of the high security "little segregation" unit was unrefuted. See <u>Valentin v. Murphy</u>, 95

8

F.Supp. 2d  99 (March 31, 2000)(holding in relevant part that placement of plaintiff in segregation at Walker was not punishment). Here, plaintiff was placed in segregation to restore or maintain order in the A & P area, and remove the plaintiff, who was disrupting the smooth and orderly functioning of the A & P unit, and he was placed on A.D. [Administrative Detention] status, pending the disposition of his D/R's for DADO and contraband. See Exh. A, p. 24; See also Exhibit R, (A.D. 9.5, at p. 12, ¶20, "Administrative Detention."

21. The video, Exhibit J, refutes the allegation that plaintiff was being forcibly held down in the chair, by forcefully pressing down on plaintiff's shoulders. To the contrary, two correctional officers maintained physical contact, but they were merely touching or resting their hands on plaintiff's shoulders, as appears on the video. Exh. J.

22. Plaintiff testified that he removed his contact lenses first, and then was subsequently restrained in the chair. His statement, Exhibit X, alleges, that plaintiff's arms were "severely" twisted behind his back, which is also untrue. Plaintiff's statement, Exh. X, also asserts that plaintiff looked directly into the camera, and proceeded to state how unjustly the administration was treating him because of his sexuality. This is another untrue statement.

23. Plaintiff was strip searched pursuant to A.D. 6.7, Exhibit "O" at p.02, ¶5. D., ("Upon initial placement in a restrictive housing, protective custody or close custody unit.") Defendants would have no reason to know that strip searching plaintiff according to DOC written policy would violate his constitutional rights. The search was conducted with respect, and without any derogatory comments toward plaintiff as he alleges. Captain Cusimano made sure that the female staff persons were not present in the area when plaintiff was strip searched.

9

24. The defendants agree that plaintiff was limping but respectfully claim that this was part of the histrionic nature of the plaintiff who was feigning injury for secondary gain. The nurse's report refutes the claim of any leg injury. See Exh B. p.06.

25. The defendants complied with A.D. 6.5 and videotaped continuously, until the action was over and plaintiff was secured in his cell. The break in the recording was identified and Officer Heller did reintroduce himself on the video as required by A.D. 6.5, ¶13. See Exh N. p. 6.

26. Nurse Carlon conducted an appropriate in-cell medical examination of plaintiff, provided him Motrin for his allegation of pain, and the exam was videotaped. The plaintiff presented no medical testimony to meet his burden of proof or to establish in any competent fashion that Nurse Carlon did not provide an acceptable exam under the circumstances.

27. Plaintiff offered no evidence of the medical claims he asserts in ¶27. Although plaintiff subjectively claimed he coughed up blood, and made that complaint to custody staff, see Exh K. at p. 04, logbook at 274. The logbook reflects it was plaintiff who made the complaint, at 11:21 a.m and that Nurse Janine Russell was on duty, and that she promptly responded to segregation to see Powell at 12:30 p.m. This is not evidence of deliberate indifference. Indeed, this is evidence of prompt attention by Nurse Russell, who was dismissed from this action as a defendant after her deposition. Certainly, Nurse Carlon can't be held liable for denying plaintiff medical attention on a day when she was not even working. Moreover, when Nurse Russell examined the plaintiff she determined that plaintiff had not been coughing up blood, but rather his spit-up was red in color because plaintiff stated he "had red juice with breakfast." Exh. B at 06. Plaintiff did not keep any specimen of his "spit-up" so no one could corroborate his allegation. Moreover, plaintiff's own medical/mental health records refute the claim that he was suicidal. Instead, they reflect that plaintiff denied any suicide ideation, was involved in

medication seeking behavior, as noted in the note of 11/27/98, Exh B at p. 05, which stated that "Despite his complaint of anxiety he is engaging and laughs readily." The mental health clinician wrote that plaintiff was demonstrating "med-seeking behavior. He is also manipulative." Exh B. at 05. On 11/30/98 plaintiff presented to mental health staff as "upbeat and engaging" again engaging in med-seeking behavior; Plaintiff "adamantly denied any suicide ideation." Id. On 12/1/98 plaintiff took the meds he had been given and dumped them down the sink. Id. Powell cross. There is no evidence to support Powell's claim of serious mental illness. Indeed, Powell admitted that the last time he had seen a psychiatrist was in DOC approximately five years ago. This is not evidence which supports plaintiff's claim that he suffers from a serious and treatable mental illness caused by the events of November 24, 1998.

28. Plaintiff misreads A.D. 9.5 and ignores the fact that he pleaded guilty to two disciplinary reports. See Exh R. at p. 12-13, ¶20, ¶ 23; Exh E., Powell cross examination. Defendants had authority to place plaintiff in segregation pending disposition of his disciplinary reports. Id.

29. There was no evidence that plaintiff suffered from a "gender identity disorder." There was no evidence that plaintiff asked for treatment for such a claimed disorder, or that Irene Carlon had any authority to provide such treatment, even if it had been requested. This is not the case of a transgender individual caught in the middle of a sex change operation who had an immediate medical necessity for treatments with hormone therapy. Instead, this is a run-of-the-mill excessive force claim where plaintiff alleged he did not get adequate treatment for some minor bruises. Indeed, because there is no evidence that Irene Carlon was personally involved in the mental health treatment team which might, under other appropriate circumstances, provide mental health counseling for a "gender identity disorder" then she cannot be held liable under

11

this newly conceived theory, which was not raised until plaintiff's pre-trial brief. Defendants objected at trial to this attempt to amend the complaint in the pre-trial and now post-trial brief.

30. Plaintiff's witness, Ms. Vaughn, testified that after the hair extensions had been cut out, plaintiff had approximately two inches of hair left. Concededly, the hair cut given by Nurse Carlon was uneven, but it wasn't "cruel and unusual punishment" nor did it inflict "unnecessary pain and suffering." Moreover, being given a bad haircut is one of the classic examples that Congress used in justifying the PLRA as necessary for reducing the burden of frivolous prisoner cases in the court. Plaintiff elected to have a very short haircut when, on 11-29-98, Exh. K at p. 23, logbook at 293, inmate Jones, the barber gave plaintiff a short haircut. It is obvious from the short haircut of approximate ¼ inch, that plaintiff did not have a large golf ball size lump on his scalp. Indeed, the barber would not have been able to use the clippers to cut plaintiff's hair that short, if plaintiff had such a "lump." See exhibit C, at pp.06-07.

31. As to plaintiff's paragraph 33, (plaintiff omits ¶¶ 31 and 32), plaintiff asserts in his post-trial brief that he did not appeal because the appeal would be futile. Indeed, he appears to argue that he pleaded guilty because the warden had already made a decision that his allegations were without any "substantiation." Pl. Exh 19. (Memo of Warden Wolff dated December 3, 1998. In fact, plaintiff had pleaded guilty to the reports prior to decemebr 3, 1998, and on December 1, 1998 waived his appeal by pleading guilty. It is illogical to claim as plaintiff does that he pleaded guilty and waived his appeal even before the Warden had responded to him, because of the Warden's decision, which was no communicated to plaintiff until after the date of the guilty plea.

34. As to paragraph 34, plaintiff offered no expert testimony to establish causation, and it is likely that plaintiff may be mistrustful of police because he has been arrested on 26 different

12

occasions. Even if plaintiff is mistrustful of police, that is not a known psychiatric condition, nor is plaintiff competent to testify that such a reaction vis a vis the police, especially "men in blue," if it is real, was caused by the defendants. It appears that plaintiff may have been afraid of the police he has a lengthy record of violating criminal laws, and was merely afraid of being caught.

With regard to the analysis of plaintiff's case, no useful purpose is served by repeating arguments that have been already briefed in connection with the motion to dismiss or in the defendants' pre-trial memorandum, and thus, the defendants file a short accompanying post-trial brief and proposed findings of fact.

## CONCLUSION

For all the foregoing reasons, plaintiff's so-called "facts' should be rejected, and the court should adopt pursuant to Rule 52 fed. R. Civ. P. the defendants' proposed findings of fact as the findings of the Court.

> DEFENDANTS
> John Armstrong et.al.
>
> ATTORNEY GENERAL
> RICHARD BLUMENTHAL
>
> By: _____
> Steven R. Strom
> Assistant Attorney General
> 110 Sherman Street
> Hartford, CT 06105
> Federal Bar #ct 01211
> E-Mail: steven.strom@po.state.ct.us
> Tel: (860) 808-5450
> Fax: (860) 808-5591

13

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following on this 10th day of October, 2003:

Jennifer Vickery, Esq.
Law Offices of Alan Rosner
1115 Main St.
Bridgeport, Ct 06604

Steven R. Strom
Assistant Attorney General

14