UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KENNETH POWELL, | : | |
|     Plaintiff | : | CIVIL ACTION NO. |
| | : | 3:00CV1638 (HBF) |
| V. | : | |
| | : | |
| JOHN CUSIMANO | : | |
| ET AL., | : | DECEMBER 16, 2003 |
|     Defendants | : | |

**PLAINTIFF'S POST-TRIAL REPLY**

I. **THE DEFENDANTS' ADMISSIONS ALONE PROVIDE ENOUGH EVIDENCE TO FIND THAT THE PLAINTIFF'S RIGHTS WERE VIOLATED.**

    A. **The Record Amply Supports the Plaintiff's Version of the Facts.**

In a separate pleading styled Defendants' Memorandum in Response to Plaintiff's Post-Trial Brief and Statement of "Facts" Therein ("Def. Response"), counsel for the defendants argues that the facts section of plaintiff's post-trial brief is devoid of evidentiary support. Having obtained the transcript in order to fully address this concern, the present section of plaintiff's Reply sets forth the plaintiff's original facts section in its entirety underlined, with the additional cites and comments based on defendants' Response following in ordinary type face.

<u>1. The plaintiff, Kenneth Powell, is a 33 year old homosexual, African-American male, who was formerly an inmate at Walker Reception and Special Management Unit ("Walker"), a facility run by the Department of Corrections in the State of Connecticut ("DOC"). On November 20, 1998, the plaintiff began serving a three year sentence for prostitution and larceny at Bridgeport Correctional Center ("BCC"). Pursuant to a sentence modification, plaintiff was released after serving 14 months out of the three year sentence, and shortly thereafter filed this lawsuit.</u>
    Tr. 9/15/03 at 50 lines 22-25; Tr. 9/15/03 at 52 lines 20-24; Tr 9/15/03 at 62, lines 21-22; Tr. 9/15/03 at 158, lines 4-14.
<u>2.</u>    <u>The plaintiff has dressed and groomed himself in women's clothing and accessories</u>

1

throughout his adult life. Prior to being incarcerated, the plaintiff had paid $100.00 to have approximately 70 multi-colored, synthetic hair extensions woven into his own, real hair at the base of the scalp. Plaintiff's hairdresser used a technique that involved melting the tips of each braided extension, resulting in a shoulder-length hairstyle that can only be removed by clipping away the melted tips and then fully undoing each braid. Removal these types of hair extensions requires a scissors, a comb, and between two and six hours' labor, depending on the skill of the individual.
   Tr. 9/15/03 at 52, lines 1-14; Tr. 9/15/03 at 54, lines 1-6; Defendants' Exhibit C, p.4; Tr. 9/16/03 at 97, line 3 through 100, line 15.
3. The plaintiff was also wearing blue contact lenses upon incarceration. The plaintiff has a mild vision deficit in one eye, which the prescriptive lenses served to correct.
   Tr. 9/16/03 at 160, line1; Plaintiff's Exhibit 16; Tr. 9/16/03 at 164, lines 5-6.
4. The plaintiff's four-day stay at BCC was without any disciplinary incidents regarding his hair extensions, or any other matter. The plaintiff was then transferred from BCC to Walker on November 24, 1998 wearing the same hairstyle and lenses, along with the standard inmate jumpsuit issued by the Department of Corrections.
   Tr. 9/15/03 at 59, lines 21-25; Tr. 9/15/03 at 56, lines13-25.
5. Upon arrival at Walker, the plaintiff was immediately verbally harassed by staff commenting on his gender identity. While he was waiting in a holding cell to be processed, word of plaintiff's hairstyle spread among the Walker staff.
   Tr. 9/15/03 at 58, lines 3-13; Tr. 9/16/03 at 72, lines2-24; Exhibit 22; Tr. 9/15/03 at 218, line 23 through 221, line 23.
6. At some point in the evening on November 24, 1998, the plaintiff was removed from the holding cell and taken to IP22, an interviewing room within the Admissions and Processing area of Walker ("A&P"). IP22 is an 8 foot by 12 foot space containing a desk and chairs. It is located directly across a hallway from the Property Office.
   Exhibit 23; Tr. 9/15/03 at 45, line 15 through 47, line 16.
7. The nurse on duty in IP22, Irene Carlon, began to perform a medical screening of the plaintiff by asking the plaintiff questions and recording the answers on the Department of Corrections' standard forms, while officers Figiela and Heller watched from just inside the doorway. At some point, Heller left the interviewing room to return to his work. On the way, he stopped to tell Officers Peterson and Sawicki about the plaintiff. From where he was working across the hallway in the Property Office, Heller could hear the ongoing interview. Within the next few minutes, Peterson and Sawicki also joined the group in IP22, apparently of their own accord.
   Exhibits 22 and 23; Tr. 9/15/03 at 8, line 15 through 11, line 8; Tr. 9/15/03 at 36, line 9 through 38, line 19; Tr. 9/15/03 at 45, line 15 through 47, line 17; Tr. 9/15/03 at 63, lines 14-16; Tr. 9/15/03 at 64, lines 11-14.

   Defendants urge the court to find that Defendant Heller was working far away from the interviewing room in the property cage, and that he and the other officers became involved in the incident solely because the plaintiff was so out of control that Nurse Carlon called on them for

assistance. Def. Response at ¶ 7. Such a finding would contrary to the testimony of Heller and Carlon themselves. Defendant Heller testified in great detail during his deposition that he was directly across the hallway from IP22 in the property office at the time, that he looked in on the scene on his own initiative and saw defendant Figiela already present, that he told Peterson and Sawicki about it, and that he returned to IP22 on his own initiative, and that Peterson and Sawicki arrived thereafter, apparently of their own initiative. Nurse Carlon testified consistently with Heller's deposition testimony, both at trial and at her deposition. Significantly, she was especially certain that she had never called on the officers to join her in IP22, as follows:

> CARLON: ... The officers were there–right there.
>
> Q: They were there in the A&P office with you, correct?
>
> CARLON: Right.
>
> Q: And they were not there because you had asked them to come, correct?
>
> CARLON: No, they were there.
>
> Q: On their own initiative, correct?
>
> CARLON: Right.

Tr. 9/16/03 at 91, lines 2-11. Although Lt. Linares and the plaintiff both agree that Nurse Carlon was the source of the radio call summoning Lt. Linares to the scene, this is a different matter. The only testimony from any witness that suggests that the officers, as opposed to Lt. Linares, came to IP22 to rescue Nurse Carlon came from Heller, led by counsel. Heller repudiated his deposition testimony by explaining that six weeks after reading his report, being deposed, listening to Nurse Carlon being deposed, and preparing for trial, he had recovered his memory.

3

Tr. 9/15/03 at 8, line 12 through 9, line 19.

<u>8. One of the officers asked Nurse Carlon to check the plaintiff's head to determine whether the braids were his own hair, which she did. When asked whether his hair was "fake," the plaintiff explained that he was wearing synthetic hair extensions.</u>
      Tr. 9/15/03 at 63, lines 10-11 and 22-25; Tr. 9/16/03 at 69, lines 3-16.
<u>9. As DOC policies do not prohibit long hair, braided hair, artificially highlighted hair, or changes in hairstyle or length, plaintiff's hair complied with the relevant rules.</u>
      Exhibits 1 and 10.
      <u>10. DOC policies deem any item that is not listed as a permitted type of property on the Inmate Property Matrix (a comprehensive listing of items inmates are permitted to keep in their possession) to be "Unauthorized Property." Administrative Directive 6.10, Exhibit Q. Ninety percent of inmates arrive at Walker with unauthorized property on their person–principally, the items they are wearing when they are incarcerated. As part of the admissions process at Walker, inmates surrender all unauthorized property items to the Property Officer. The property officer records and stores these belongings so that they can be returned to the inmate when he leaves Walker. Under these rules, plaintiff's hair extensions were unauthorized property.</u>
      Tr. 9/15/03 at 21, lines 21-25; Exhibit R.

Defendants curiously assert that the above paragraph is an admission that plaintiff's braids were contraband. Actually, the above paragraph states that the braids were unauthorized property. According to the Exhibits cited in this paragraph, this classification of the braids, unlike contraband, would not have resulted in any disciplinary action being taken against the plaintiff. Defendants also assert that there was a policy that clearly prohibited the hair extensions, but fail to point out where they find this policy in any DOC directive. Pointing to Administrative Directive 9.5 (Defendants' Exhibit R, section 3.E) regarding contraband begs the question, because the definition of "contraband" therein is a general one–any unauthorized property found in the possession of the inmate *after* the inmate has been fully admitted to the facility. As defendant Heller testified at trial, the difference between unauthorized property and contraband is that "Unauthorized property would be property that they came in with: clothing items, items that–obviously they were wearing on the street, [in] that they had to be wearing something when

4

they came in. Contraband's an unauthorized item allowed inside the facility, a dangerous weapon, so forth." Tr. 9/15/03 at 7, lines 2-7. Thus under the Administrative Directive and the property officer's definitions, the hair extensions were not contraband because they were a non-dangerous item that the plaintiff had just happened to arrive wearing. Indeed, plaintiff's braids never became contraband because he never refused to remove them--he simply was not given a realistic chance to do so.

11. <u>Carlon told the plaintiff he would have to surrender his hair extensions and lenses. In response, plaintiff began to explain what it would take for him to remove the hair extensions; in the midst of plaintiff's attempt to explain the process, Carlon asked the officers present to assist her by making the plaintiff remove his hair extensions.</u>
     Exhibits 22 and 24; Tr. 9/15/03 at 63, lines 10-25.

12. <u>Officer Figiela moved into a standing position within a few feet of the plaintiff, and began shouting and using profanity as he was telling the plaintiff to do as the nurse had said. The plaintiff remained seated and again tried to explain why he could not remove the hair extensions immediately. While Figiela continued shouting over the plaintiff's explanation of the difficulty of removing the hair extensions from his hair, Carlon dialed the telephone on her desk.</u>
     Tr. 9/15/03 at 66, lines 9-25; Exhibit 24.

13. <u>All of the defendants present in IP22 (Carlon, Figiela, Heller, Linares, Peterson, and Sawicki, hereinafter collectively referred to as the "A&P Defendants") perceived the plaintiff as homosexual or transsexual, based on his demeanor, the multi-colored hair extensions, the statements of other staff at Walker, and/or his affirmative answer to the question, "Have you had sex with someone of your own sex?" on the Intake Health Screening form, Exhibit 29; Testimony of Carlon and Linares. Figiela articulated this perception by using offensive, insulting slang words such as "faggot" and "dicksucker" to refer to the plaintiff while shouting orders at him to remove his hair extensions; other defendants joined in the verbal harassment of plaintiff's sexuality on and off throughout the evening. None of the defendants attempted to intercede when Figiela or any other officer made harassing remarks.</u>
     Tr. 9/15/03 at 66, lines 21-25; Tr 9/15/03 at 68, line 25 through 69, line 4; Exhibits 22 and 24.

     The question about sexual practices cited from question 12 (c) of page 2 of Exhibit 29 is relevant for its bearing on the credibility of the claim by defense counsel that no one at Walker facility knew that the plaintiff was homosexual. Thus, contra to paragraph 13 of Defendants' Response, the evidence showed with certainty that Nurse Carlon was in a position to know about

5

plaintiff's sexual orientation. Nurse Carlon also, however, admitted to knowing it, in the following exchange during her deposition:

> Q:        To your knowledge, was Mr. Powell a homosexual?
>
> CARLON:   I've been told that he was.

Although Lt. Linares tried to deny any knowledge that the plaintiff is homosexual, his volunteered on the topic of hair extensions that, "I know that, just like girls, they highlight their hairs," during his deposition, suggesting that he did in fact fully understand that Mr. Powell was presenting himself in a feminine manner.

Although the plaintiff did testify to his discomfort when asked the question in a setting that he had already found unwelcoming of his sexuality, he has made no legal claim that asking the question was a violation of his rights. The existence of the <u>Doe v. Meachum</u> consent decree only confirms plaintiff's point, which was that the defendants' claims that they were not aware of the plaintiff's sexual orientation are not credible.

<u>14. Lt. Linares was summoned to the A&P interviewing room by a radio call. Upon his arrival, Carlon told Lt. Linares that the plaintiff had been given two direct orders to remove his braids, but had not yet complied with the orders. Lt. Linares then turned to the plaintiff and ordered him to remove his hair extensions. The plaintiff began again to explain why he was not able to comply with the order.</u>
Tr. 9/15/03 at 68, lines 2-6; Exhibit .

Defendants claim in paragraph 11 of their Response that the record reflects that the plaintiff said "the lieutenant should do whatever he had to f. . .in do to remove them." But this profane statement was never testified to by Lt. Linares in any context. Lt. Linares actually said that he remembered the exact words that plaintiff used as being, "You do what you have to do." Tr. 9/16/03 at 130 , lines 10-11. However, Lt. Linares gave even this testimony just minutes after

insisting that he had *no* memory of the plaintiff's exact words:

> LT: The way Mr. Powell came off at me when I asked him to remove the hair extensions told me that he wasn't gonna do it. He was not gonna comply with my order.
>
> Q: . . .So his exact words were what?
>
> LT: The exact words, I can't recall, but I know that he told me he wasn't gonna do it.  Tr. 9/16/03 at 119, lines 6-22.

This inconsistency should not be deemed sufficient to overcome the vivid recollections of the plaintiff. Lt. Linares' claimed lack of recollection of the very first incident that he had ever commanded does not ring true.

<u>15. Under DOC policies, officers have no authority to engage in a use of force based on an inmate's inability to follow an order. Exhibit M; Exhibit 24.</u>

Post-trial, defense counsel vehemently argues that transsexual and artificial hair extensions were nothing out of the ordinary in Walker. Def. Response at ¶¶ 2 and 7. In that case, it is especially hard to understand the defendants' insistence that the plaintiff get the braids off immediately, and without using a scissors to unclip the melted ends of the braids. As defendant Heller admitted, it was not reasonable to expect immediate compliance. Tr. 9/15/03 at 21, lines 13-18. If the plaintiff's inability to remove the braids was apparent to the guards, then their orders to him to remove them were simply exercises in futility. Indeed, with respect the contact lenses, the plaintiff had to actually tell the guards that in order to comply with their orders to remove them, his hands would have to be freed. Exhibit 16. On cross examination, plaintiff eloquently described how being in this position felt: "I–well, once they released my hand, I was so agitated, nervous, shaking, I was just totally at a loss, and I thought they was going to repeat

the offense again if I didn't take out the contact lenses. I would a gave 'em my eyeballs." Tr. 9/15/03 at 121, lines 2-6.

16. Throughout the time he spent in IP22, the plaintiff never refused to remove his hair extensions. None of the A&P defendants offered the plaintiff a comb or scissors, or attempted to make it possible for the plaintiff to actually comply with the orders to remove the hair extensions.
    Tr. 9/15/03 at 18, line 14 through 21, line 18.; Tr. 9/16/03 at 123, lines 20-25.
17. Lt. Linares immediately ordered Heller and Figiela to escort the plaintiff to segregation. Heller and Figiela seized the plaintiff, pinned his arms behind his back, and carried him by his elbows down a twenty foot hallway, through two sets of doors, and into the segregation foyer. The plaintiff was choking against the neck of his jumpsuit because his feet were not touching the floor during this transfer. All of the A&P Defendants, except for Carlon, followed immediately behind Heller and Figiela.
    Tr. 9/15/03 at 67, line 5 through 68, line 19; Tr. 9/16/03 at 126, line 21 through 127, line 11.

No defendant in this case has ever claimed that anything more than a *generalized* concern for security permitted the use of force against Kenneth Powell. Although the defendants attempted to raise the specter of concerns about order based on the nearby bullpen, they did not offer any specific factual event that suggested order was being threatened at that time by the plaintiff. Moreover, there is not even a plausible generalized rationale for thinking that allowing the plaintiff enough time to comply would have disrupted order in the A&P area *more* than physically hauling him away did. As Lt. Linares admitted at trial, the officers could easily have supplied a scissors and comb and put the plaintiff in an empty cell to do the task of removing his braids. This solution would have undoubtedly defused any issue with the listening inmates in the bullpen area, saved the staff time and resolved the incident peacefully.

Therefore, any concerns the defendants had about security were untethered to anything about the plaintiff himself or his inability to follow the order given. Defendant Carlon, who was the first defendant who encountered the plaintiff, clearly stated two separate times that she herself was never afraid of the plaintiff, and never called for help: once in her deposition, and

8

again in her testimony at trial. Exhibit 22; Tr. 9/16/03 at 90, lines 17-25 and 91 at lines 1-12. This statement is consistent with the factual testimony by defendants Heller and Linares, who both said that the plaintiff remained seated during his interview in IP22. Exhibit 24; Tr. 9/15/03, lines 20-25.

Linares and Heller each offered justifications for their treatment of the plaintiff, but these justifications fell well short of claiming that the plaintiff himself posed a security risk. Linares claimed that the nearby bullpen was his reason for trying to remove the plaintiff from the area, even though shutting the door would seem to have been a far more pragmatic response, while Heller stated that he feared for Carlon's safety, even though she herself did not. <u>Dodge v. County of Orange</u>, 2003 WL 2219194 (S.D.N.Y., September 9, 2003) recently affirmed that strip searches of pre-trial detainees must be founded on a reasonable suspicion. The Court said that the justifications offered by the defendant correctional institution–that security, smuggling, and efficiency necessitated routine strip searches–were not adequately supported by evidence. Similarly, in this case, the defendants must provide more than mere possibilities for why they seized the plaintiff's person.

The same reasoning applies to the defendants' claims about why they needed to seize the plaintiff's hair extensions. Heller and Linares said that the plaintiff's hair extensions "could have" been dangerous, but had no ready answer as to why they treated them differently than other items of headgear that are allowed to all prisoners, and are equally capable of some dangerous uses. Exhibit 10. Furthermore, common sense suggests that items such as hats, handkerchiefs, and shoelaces are much more readily usable for dangerous purposes such as strangulation, because they are easily removed. In contrast, before using the hair braids for such dangerous

9

purposes, the plaintiff would have had to be in possession of additional contraband, such as a razor or scissors.

The protections against such unreasonable seizures provided by Sections 7 and 9 of Article First of Connecticut's Constitution are even broader. A generalized claim of suspicion provides no defense for seizing anyone under the state constitution. Since at least 1731, prior to the adoption of Connecticut's constitution in 1818, Connecticut's courts have insisted that due process of law be applied in a particularized manner, on a case by case basis. See generally, State v. Kimbro, 197 Conn. 219 (1985); Gruman v. Raymond, 1 Conn. 40 (1814) (citing Smith v. Bouchier, 2 Stra. 993 (1731)). Defendants readily agreed that nothing about the behavior of the plaintiff himself led them to believe that he was particularly likely to do anything violent with his headgear than the average inmate does with their headgear. Using these speculative statements to justify occasionally seizing any inmate is analogous using a nameless warrant to seize any suspect. Neither is consistent with Connecticut's Bill of Rights.

18. Outside the context of an emergency, the defendants are not authorized by the DOC to engage in an unplanned use of force. Defendant's Exhibit N.

Lt. Linares violated the first step of the disciplinary process: verbal intervention. Captain Cusimano's testimony confirmed that this step is not optional–the Administrative Directive on Use of Force does not permit the use of physical force until after "a serious threat to security" occurs, such as an emergency or a life threatening situation. Tr. 9/16/03 at 60,line 3 through 61, line 16. He admittedly spent no time communicating with the plaintiff to investigate the situation himself, and he did not take even the most routine measures, such as handcuffing the plaintiff, to ensure that no emergency would occur. Tr. 9/16/03 at 117, lines 19-25; Tr. 9/16/03 at 121, lines 2-7; Tr. 9/16/03 at 124, lines 7-8.

19. Upon entering the segregation foyer, the plaintiff's head was slammed up against a wall; his leg was then kicked out from under him as he was pinned to the ground with one officer's knee planted in his back.
    Tr. 9/15/03 at 69, lines 7-22.

20. Upon entering the segregation foyer where the plaintiff had been pinned on the floor, Cusimano took over command from Linares. Cusimano had decided to order that the plaintiff's hair be cut off prior to entering. Cusimano's purpose in giving this order was to punish, intimidate and humiliate the plaintiff for his sexual orientation. Plaintiff told Cusimano that he believed that Cusimano was treating him unprofessionally and requested the presence of a state trooper because he felt threatened. In response, Cusimano said, "Shut the fuck up, you ain't getting nothing."
    Tr. 9/15/03 at 219, lines 3-22. Tr. 9/15/03 at 70, line 7 through 71, line 25.

21. Cusimano ordered that certain portions of the activities that followed his entry into the segregation foyer be videotaped. Videotaping began after the plaintiff had been put into a chair with his hands cuffed behind his back. Two officers stood by, each with one hand pressing down onto the plaintiff's shoulders, while the Nurse Carlon was standing behind the plaintiff with scissors in hand.
    Tr. 9/15/03 at 114, lines 16-25; Exhibit J.

22. Cusimano ordered the plaintiff to remove his contact lenses. The plaintiff replied that he could not do so with his hands cuffed. As soon as the plaintiff's hands were uncuffed, he removed his contact lenses.
    Exhibit 16.

23. Plaintiff was then strip searched. All of the A&P Defendants, plus the Captain, remained on the scene in the segregated unit, despite plaintiff's total lack of resistance at that point. Testimony of Cusimano and Derota; Exhibits A and J. An additional two officers who were generally assigned to the segregated area, Derota and Sanchez, entered and left the area at various moments; thus, the plaintiff was shorn and strip searched in front of eight to ten persons.
    Exhibits A & J; Tr. 9/15/03 at 224, lines 3-11.

24. After the strip search, the plaintiff was videotaped limping to his cell.
    Exhibit J.

25. The camcorder was then stopped for several minutes. Testimony of Cusimano; Exhibits 2, A, and J. While the camcorder was off, Carlon was called back into the segregation area from the A&P, where she had resumed her post.
    Exhibit A; Tr. 9/16/03 79, lines 9-23.

26. When she arrived, Carlon conducted a short, in-cell medical examination of the plaintiff in front of the camcorder and all of the other defendant officers.
    Exhibit J; Tr. 9/16/03 at 81, line 14 through 82, line 12.

27. In the weeks following the November 24 incident, plaintiff suffered significant pain in his head and knee; at one point he coughed up blood. Psychologically, plaintiff experienced depression, suicidal ideation, anger, anxiety, insomnia, and sense of worthlessness. Plaintiff's Exhibits 12, 17, and 27.
    Tr. 9/15/03 at 84, line 4 through 89, line 11.

28. The defendants thereafter kept the plaintiff in segregation for several days as a punishment.

     Exhibit A.
29. Although she was aware of the diagnosis "gender identity disorder," Carlon failed to treat, diagnose or screen the plaintiff's gender identity issues.
     Tr. 9/16/03 at 73, lines 9-23.
30. The plaintiff made several attempts to address the incident with Walker's warden. Testimony of Powell; Exhibits 12, 18, and 20. The warden ordered that the bizarre results of the plaintiff's haircut from Carlon be fixed by the prison barber, but otherwise informed him that the Department of Corrections had acted properly in the incident. In order to even out the patches left by the first haircut, the prison barber had to remove virtually all of the plaintiff's hair.
     Tr. 9/15/03 at 154, line 4 through 159, line 16.
33. The plaintiff pled guilty to the Disciplinary Report filed against him for wearing the hair extensions because requesting a hearing would have required him to remain in the segregated area of the prison, and because he believed that appealing the disciplinary action against him would be futile, in light of the warden's decision.
     Id.
34. In the three years since he was released from prison, the plaintiff has found that he is now more distrustful of all types of authority figures, especially "men in blue." Plaintiff therefore has avoided calling on the police, even when he was assaulted on the street and needed their assistance, because his experience with the defendants has convinced him that he is likely to be humiliated rather than helped.
     Tr. 9/15/03 at 84, line 4 through 89, line 11.

    **B.**    **Defendants' Undisputed Testimony Alone Establishes Violations of the Plaintiff's Federal and State Constitutional Rights.**

Finally, it is important to note that the defendants' testimony *by itself* establishes that Captain Cusimano violated Kenneth Powell's rights. Giving effect solely to the portions of the defendants' collective testimony that were not contradicted by their own or any other defendant's testimony, or any documentary evidence, would yield the following facts: (1) The plaintiff explained that he was wearing fake braids woven into his own hair while being interviewed by Nurse Carlon; (2) Defendant Figiela told the plaintiff to remove the braids; (3) Meanwhile, Captain Cusimano was informed that plaintiff had hair extensions; (4) Lt. Linares arrived and Nurse Carlon told Lt. Linares that the plaintiff had refused an order; (5) Lt. Linares ordered officers Figiela and Heller to escort the plaintiff to segregation; (6) The plaintiff began to resist,

so he was put into the prone position on the floor of the segregation foyer; (7) Captain Cusimano entered the area and ordered defendant Heller to get a camcorder; (8) The plaintiff was placed on a chair with his hands cuffed behind his back; (9) Captain Cusimano ordered that the plaintiff's hair be cut off and it was; (10) Captain Cusimano ordered that female personnel leave the area; (11) Handcuffs were removed and the plaintiff took off his contact lenses; (12) Officers Derota, Figiela, Heller, Linares, Peterson, and Sawicki watched while Captain Cusimano strip searched the plaintiff. On these facts, the plaintiff suffered violations of his right to privacy–being unnecessarily shorn and publicly strip searched–as punishments for noncompliance with an order that was physically impossible for him to obey. Captain Cusimano, at least, is liable for them.

This exercise in analysis also provides an important illustration of the overall incoherence of the defense. Even if the Court accepted the contention of defendants' counsel that the presence of other inmates in the A&P justified Lt. Linares' order to move the defendant to segregation, no similar justification could be found for Captain Cusimano's orders. Counsel states in its Response that both hair extensions and long hair on men were non-events in the prison system, and that plaintiff "was treated the same as any other inmate in possession of contraband. He was given a disciplinary report. Plaintiff also disobeyed a direct order, and pleaded guilty. He was sent to segregation on A.D. [Administrative Detention] pending the disposition of his disciplinary reports." Def. Response at ¶¶ 2 and 5. Later, defense counsel addresses the actions of Captain Cusimano specifically by stating that placing an inmate in segregation for disobeying an order (paragraph 20) and strip searching upon placement in segregation (paragraph 23) are standard practice. These paragraphs demonstrate that even the defendants' counsel cannot come up with an excuse for Captain Cusimano's decision to

13

completely cut off the defendants' hair and strip search him before six idle onlookers. Perhaps Lt. Linares' testimony is the most telling on this point: "He could've been put in a single cell by himself and he could have removed the extensions while staff took care of other duties they had, like the AP officers, they would've been around that area and they could've kept looking in on him. . . . It would've saved the whole incident." Tr. 9/16/03 at 122, lines 11-17. At the point where Captain Cusimano had uncuffed the plaintiff, and the plaintiff had promptly and quietly removed his contact lenses, there was no justification non-punitive reason for going ahead with shaving his head.

## II. PLAINTIFF'S TESTIMONY THAT THE DEFENDANTS PHYSICALLY AND VERBALLY PUNISHED HIM FOR BIGOTED REASONS IS SUPPORTED BY CIRCUMSTANTIAL EVIDENCE.

Direct evidence of discriminatory acts is rare. For this reason, in civil cases discriminatory intent is often proven through circumstantial evidence, such as differences in treatment. See, e.g., Teamsters v. United States, 431 U.S. 324, 335 (1977). In this case, the evidence of bigoted treatment is quite strong, because the record contains both the vivid, specific testimony of the plaintiff of bigoted language, and corroboration of key facts in that testimony.

Documentary evidence supports the plaintiff's testimony that he was physically mishandled.

Where the facility itself immediately thereafter prescribed treatments and other ameliorative actions for the plaintiff–prozac, motrin, and a haircut–the defendants cannot simultaneously claim that nothing happened to the plaintiff. The logbook entries recording these events in the days immediately following November 24, 1998, and the testimony of Fred Derota from the logbook, therefore corroborate plaintiff's testimony. Exhibit 27, similarly, shows that plaintiff

14

was depressed enough so that medication was prescribed, and that plaintiff explained that the incident with the defendants was the cause of his depressed state. Defendants' Response correctly notes that giving the plaintiff a bad haircut would not by itself justify a claim for damages. However, that is not the plaintiff's claim. The fact that the plaintiff was given a second, extremely short haircut is relevant as circumstantial evidence that something happened to the plaintiff that was out of the ordinary. As defendant DeRota explained,

> Q: So, it's quite unusual for Mr. Powell to have a second haircut a few days after he had had a first one, correct?
>
> DEROTA: Correct.
>
> Q: And it wouldn't just happen purely because Mr. Powell cosmetically wanted one, isn't that correct?
>
> DEROTA: Correct.

Tr. 9/15/03 at 204, line 21 through 205, line 2.

Plaintiff readily stated on direct as well as cross that he was incarcerated on multiple occasions between 1989 and 1998. His openness was consistent with Thomasene Vaughn's testimony that she knew him to be an honest person, based on her experiences growing up with him and having him as a client, for a total of 20 years. Tr. 9/16/03 at 97, lines 7-20; Tr. 9/16/03 at 103, lines 8-13. Moreover, as the evidence provided by the defendants shows, the plaintiff has not been arrested, charged, or incarcerated for anything in the three years since he was released early from the period of incarceration during which this incident occurred.

Defendants opine that, because the plaintiff could not be sure which of the events related in his original pro se complaint and his trial testimony were on video, he lacks credibility. Def.

15

Response at ¶ 22; Def. Post-Trial Brief at pp. 1-2. The plaintiff clearly explained under cross-examination that he could not be certain which actions or remarks occurred *on* video:

| | |
|---|---|
| POWELL: | Everybody in there was laughing except me. |
| Q: | Okay. They were all laughing. |
| POWELL: | Except me. |
| Q: | Okay, and this was all while the videotape was running, correct, sir? |
| POWELL: | I'm not at liberty to know whether or not this camera was on. I just know what took place before me. |
| Q: | Well, you've had an opportunity to review the video, haven't you, with– |
| POWELL: | I never watched that video. To this day, I still have not watched that video. I don't want to watch it. |

Tr. 9/15/03 at 120, lines 5-19. The plaintiff's inability to watch the video is consistent with a reaction to trauma. However, none of the defendants claimed full knowledge of when the camera was running, either. See, e.g., Tr. 9/15/03 at 168, lines 3-7; Tr. 9/15/03 at 202, line 20 through 203, line 2. Captain Cusimano admitted, in addition, that the single camcorder did not record all the interactions or all the persons present. Tr. 9/16/03 at 53, line 19 through 55, line 23.

Kenneth Powell freely volunteered that he was well treated by other DOC staff, and his conduct both at trial and before it showed no desire to maximize his damages, engage in a personal vendetta, or win at all costs. If the plaintiff had been trying to set up a lawsuit, as charged in the Defendants' Post-Trial Brief, he could easily have done a much better job of

16

creating a record of damages to himself. In fact, he has not claimed any lasting physical or mental health damages; his complaints and testimony were narrowly addressed to the emotionally distressing experience of being humiliated, and the consequent damage done to his ability to feel safe and get help from persons in authority.

Finally, it is worth noting that the plaintiff's testimony about the bigoted epithets used by Officer Figiela was never fully refuted. Cf. Def. Response at ¶ 12. The defendants chose not to present testimony from defendant Figiela. Both Heller and Linares arrived in IP22 after Figiela, so neither could testify as to his behavior during the entire time that Figiela was with the plaintiff. See Exhibits 22 and 24. And Nurse Carlon, who certainly was present throughout the time that defendant Figiela interacted with the plaintiff, did address in her testimony, either on cross examination or direct, the plaintiff's statements about Figiela's behavior. Tr. 9/16/03 at 67, line 4 through 94, line 23.

                Respectfully submitted,

                THE PLAINTIFF, KENNETH POWELL

                By_____
                    Jennifer Vickery (ct24089)
                    Law Offices of Alan Rosner
                    1115 Main Street, Suite 415
                    Bridgeport, CT 06604
                    Tel (203) 384-1245
                    Fax (203) 384-1246

## CERTIFICATION

      I hereby certify that the Plaintiffs' Post-Trial Reply was served by mail on December 16, 2003 on the defendants' attorney, addressed to:

Steven Strom, AAG  
State of Connecticut  
Office of Attorney General  
110 Sherman Street  
Hartford, CT 06105  
Fax: (860) 808-5591

_____  
COMMISSIONER OF SUPERIOR COURT