UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                  :
KENNETH POWELL                    :
                                  :
v.                                :   CIV. NO. 3:00CV1638 (HBF)
                                  :
CAPT. JOHN CUSIMANO,              :
LT. EDWARD LINARES,¹              :
C.O. DONALD FIGIELA,              :
C.O. EDWARD HELLER,               :
C.O. BRIAN SIWICKI,               :
C.O. FRED DEROTA,                 :
C.O. SCOTT PETERSON, and          :
IRENE CARLON                      :
                                  :
                                  :
                                  :
```

BENCH RULING

Kenneth Powell, a former state prisoner, brings this civil

rights action against eight employees[2] of the Connecticut

Department of Corrections ("DOC"), alleging violation of his

rights under the Eighth and Fourteenth Amendment the United

States Constitution and various state law claims.[3]  Plaintiff

---

[1]Lieutenant Linares identified himself as "Edgardo Linares" at trial. [Doc. #81 at 110].  He was identified in the amended complaint as "Edward Linares". [Doc. #40].  In this ruling the Court will refer to the Lieutenant as Edgardo Linares.

[2]The defendants are Captain John Cusimano, Lieutenant Edgardo Linares, Corrections Officers Donald Figiela, Edward Heller, Brian Siwicki, Fred DeRota, Scott Peterson and Nurse Irene Carlon.

[3]The Amended Complaint contains the following seven counts: (1) deliberate indifference to serious medical needs under the Eighth Amendment; (2) excessive force under the Eighth Amendment; (3) violation of Conn. Gen. Stat. §53a-181k "Intimidation based on bigotry or bias in the second degree: Class D felony" and §52-571c "Action for damages resulting from intimidation based on bigotry or bias"; (4) "employing unnecessary, excessive and unreasonable force against plaintiff by denying medical attention and by making bigoted, biased statements and committing bigoted

seeks compensatory damages, punitive damages, treble damages
under Conn. Gen. Stat. §52-571c(b) and attorneys' fees and costs
under Conn. Gen. Stat. §52-571c(b) and 42 U.S.C. §1988.

A bench trial was held on September 15 and 16, 2003. Edward
Heller, Kenneth Powell, Fred DeRota, John Cusimano, Irene Carlon,
Thomasena Vaughn and Edgardo Linares testified at trial.
Testimony and evidence adduced at the hearing are summarized
below as necessary to explain the Court's findings and
conclusions.

FINDINGS OF FACT

Based on the credible testimony, the exhibits, and the
entire record compiled during the trial, including a videotape of
the subject incident [Def. Ex. J], the Court finds established
the following facts which are relevant to this ruling.[4]

1.   Plaintiff, Kenneth Powell, is a thirty-three (33) year old
     male who was formerly an inmate at Walker Reception and
     Special Management Unit ("Walker"), a facility run by the
     Connecticut Department of Corrections.

2.   On November 20, 1998, plaintiff was sentenced on five

_____

and biased actions" in violation of his Equal Protection under
the Fourteenth Amendment; (5) acts of intimidation and harassment
based on plaintiff's  sexual orientation proscribed by Conn. Gen.
Stat §§53a-118k and 52-571c in violation of the Fourth, Eighth
and Fourteenth Amendments; (6) violation of Sections 1, 7, and 9
of the Connecticut Constitution; and (7) intentional infliction
of emotional distress.

     [4]The parties stipulated to certain facts, which are listed
in the Plaintiff's Trial Memorandum [Doc. #71], and cited in this
opinion as "Stip."  Transcripts of the trial are also part of the
Court's record. [Doc. ##80, 81].

different criminal convictions, including Larceny third

degree, (Conn. Gen. Stat. §53a-123), three counts of

violation of probation, (Conn. Gen. Stat. §53a-32) and one

count of prostitution (Conn. Gen. Stat. §53a-82).  He was

ordered to serve concurrent sentences for a total effective

sentence of three years. [See Mittimuses, Ex. G;  Doc. #80

at 94].

3.    Powell also had two prior felony drug convictions, one for

possession of narcotics and one for sale of narcotics, [Doc.

#80 at 94], and twelve separate convictions for larceny,

sixth degree. [Doc. #80 at 95].

4.    On November 23 and 24, 1998, Kenneth Powell was an inmate of

the Connecticut Department of Corrections. [Stip.]. He was

incarcerated at the Bridgeport Correctional Facility on

November 23, then transferred to Walker on November 24,

1998. [Stip.].

5.    On cross examination, in response to the question, "Mr.

Powell, on direct examination you indicated that you, 'were

arrested one or two times.' Isn't it true, sir, that in

fact, you were arrested 26 times?,"  Powell responded, "I

mean, well, if we got to get into it basically. I just

basically threw that out there to show you that I'm not new

to being arrested." [Doc. #80 at 93].

6.    Powell testified that he was very familiar with all aspects

of rules, procedures and regulations of the Department of

Corrections, as he had been incarcerated, as he said, at

3

least "one or two times" over the years. [Doc. #80 at 93, 157].

7. Powell testified,

> I've been in the Department of Corrections,
> you know, as I stated, a few times, and I do
> know the procedures and the way in which that
> inmates and staff members interact.  I know
> about the [mailing] system, recreation,
> medical, mental health.  I'm fully
> knowledgeable and aware of all that goes into
> an institution."

[Doc. #80 at 157].

## Arrival at Walker

8. Powell was transferred from Bridgeport Correctional Center to Walker Reception and Special Management Unit ("RSMU") on November 24, 1998. [Doc. #80 at 53, 137].

9. Plaintiff stated that he was not "too particularly sure" any of the defendants were present on his arrival at Walker on November 24, 1998. [Doc. #80 at 139].

10. On November 24, 1998, the defendants were employed by the State of Connecticut and were assigned to Walker. [Stip.].

11. On November 24, 1998, Lieutenant Edgardo Linares was on duty at Walker during the second shift. Linares supervised defendant Corrections Officers Donald Figiela, Brian Siwicki, Fred DeRota and Scott Peterson on that shift. [Stip.]

12. On November 24, 1998, Nurse Irene Carlon was on duty at Walker during the second shift. [Stip.].

13. On November 24, 1998, Officer Fred DeRota was on duty in the

segregation unit at Walker. [Doc. #80 at 170].  As a
segregation officer, he was responsible for maintaining a
logbook of all the activities in the unit.  Id.

14.  On November 24, 1998, Captain John Cusimano was on duty at
Walker.  He was responsible for facility operations. [Doc.
#80 at 211, 221].

15.  On November 24, 1998, Officer Edward Heller was assigned to
the second shift as a property officer working in the
property room of the Admitting and Processing  ("A & P")
area of Walker. He was responsible for the intake and
inventory of inmate property. All inmate property was
searched for contraband on intake. [Doc. #80 at 6; Def. Ex.
L].

16.  At the time of his transfer to Walker, plaintiff was wearing
artificial braided hair extensions woven into his own real
hair. [Stip.; Pl. Ex. 14].

17.  Mr. Powell knew that his fake hair extensions were
contraband; indeed, he testified that he was "well aware of
that." [Doc. #80 at 136].

Medical Intake Interview

18.  After arriving at Walker, Powell was escorted from the
holding cell to the interview room for a medical intake
interview performed by Nurse Carlon. [Doc. #80 at 58; Pl.
Ex. 29].

19.  Powell was wearing artificial braided hair extensions and
blue contact lenses upon his admission to Walker. [Doc. Def.

Ex. C; Pl. Ex. 16].

20. Nurse Carlon testified that she received a direct order to check Powell's hair. [Doc. #81 at 69].

21. Administrative Directive 6.10, Inmate Property, defines "contraband" as "[a]nything not authorized to be in an inmate's possession; used in an unauthorized or prohibited manner; or altered in any way." "Unauthorized property" is defined as "[p]roperty which is either not allowed by the terms of this Directive or is in excess quantity of property permitted by this Directive." "No inmate will be permitted to retain ay item which does not conform to the Inmate Property Matrix or is in excess of the quantities allowed in Section 16 of this Directive." [Def. Ex. Q].

22. Administrative Directive 9.5, Code of Penal Discipline, defines "contraband" as "[a]nything not authorized to be in any inmate's possession or anything used in an unauthorized or prohibited manner." [Def. Ex. R].

23. Powell's clinical record states for November 24, 1998, written by Nurse Carlon: "Unable to do assessment at this time due to inmate being uncooperative and belligerent, refused to remove fake braids and contact lenses. Given direct order to do so, refused - Captain Cusimano notified of the fake braids. Removed to seg by this writer. Contact lenses removed by inmate, placed in sterile cups and saline solution, marked and placed in property. Head to toe check done but no injuries noted at this time or bruises, good

6

R.O.M. [range of motion] all extremities, no open areas, neuro check done, pupils equal and reactive to light." [Def. Ex. B at 6; Doc. #81 at 86-87].

24. Officer Heller was processing inmate property in the Property Cage when he heard loud voices coming from the Nurse's interview room, IP 22, where Nurse Carlon was conducting medical intake interviews. [Doc. #80 at 11; Def. Ex. L]. Carlon called Heller into the room. [Doc. #80 at 11, 37-38; Def. Ex. A at 08].

25. Officer Donald Figiela was working in the A & P area and also responded to the loud voices coming from the nurse's interview room. [Doc. #80 at 8-9].

26. Heller testified that plaintiff's demeanor, raised voice and continued noncompliance with direct orders raised concerns in Heller's mind for Nurse Carlon's safety. [Doc. #80 at 35-36].

27. Figiela gave Powell a direct order to remove his contraband hair braids and Powell refused in a threatening manner, stating he was not going to remove his hair braids and that the correction officers were not going to remove them either. [Doc. #80 at 11, 29-30; Def. Ex. A at 22].

28. Nurse Carlon noted in her medical chart that Powell was argumentative and belligerent, refusing to remove his fake hair braids and his contact lenses. She called the shift supervisor, Capt. Cusimano, who directed Lt. Linares to respond to the nurse's office. [Def. Ex. A at 02; Def. Ex. B

7

at 01, 06; Def. Ex. H at 330].

29. Heller testified that, after plaintiff refused Figiela's direct orders, Heller left the office and told Officers Siwicki and Peterson. [Doc. #80 at 14]. Heller then returned to the interviewing office. [Doc. #80 at 15].

30. Heller testified that Powell adamantly refused to remove his braids. [Doc. #80 at 30; Def. Ex. A at 8]. At no time did Powell request a comb or indicate by body movement, gesture, or in any way that he was willing and cooperative to remove his hair braids. [Doc. #80 at 34].

31. Lt. Linares responded to a radio call, arrived in the interview room, and was apprised of the situation by his staff. [Doc. #81 at 113].

32. Upon his arrival, he was informed that Powell had refused a direct order from Nurse Carlon and Officer Figiela to remove the braids. [Doc. #81 at 116-117].

33. Linares gave plaintiff a direct order to remove the braids. "When I gave Mr. Powell the direct order to remove his braids, he - his eyes opened up and he looked at me and said, 'I'm not removing my braids, so you do what you have to do.'" [Doc. #81 at 118-120, 130].   "It was like it was in the video, he was like arrogant towards the direction that I was giving him, like I was bothering him by asking him to do this." [Doc. #130].

34. In response to the question, "You didn't want to investigate, since you testified that you didn't really

understand the nature of the hair extensions?," Linares replied, "I believe that Mr. Powell is an adult and he had a choice to make, and he made a choice before I arrived at that office." [Doc. #81 at 124].

35. In response to the next question, "And so you didn't have any investigation to do, even though you were the supervisor of the incident?," Linares replied, "Mr. Powell had refused two direct orders from staff, he refused my order. He never asked me to give him time." [Doc. #81 at 124, 153, 157-58].

36. Linares stated that Powell never asked for time, he never asked for a comb, he never asked for help removing the braids. Powell made no effort to demonstrate compliance with the orders given. [Doc. #81 at 134].

37. Nurse Carlon testified that, if it had been requested, she did not have a comb to give plaintiff. [Doc. #81 at 94].

38. Capt. Cusimano testified that "technically, an inmate doesn't have to be directly told, 'You are being given a direct order.' It's understood that a staff member's instructions to an inmate, at all times, are a direct order, and they are to be complied with expeditiously, and if an inmate fails to do so, he is in violation of the code of penal discipline." [Doc. #81 at 23].

39. Administrative Directive 9.5(13), Code of Penal Discipline, states it is a Class B Offense to disobey a direct order, "Failing to comply expeditiously with an instruction of a staff member or failing to comply with any disciplinary

9

sanction imposed." [Def. Ex. R at 9].

Escort to Segregation

40.  Linares ordered Figiela and Heller to escort Powell to
     segregation to remove Powell from the interview office where
     the nurse had to do intakes. [Doc. #81 at 126, 135

41.  Linares was concerned that Powell's disturbance would
     agitate the fifteen or more inmates who were in the holding
     cell just a short distance from the nurse's office. "I was
     trying to keep the incident from escalating, and just
     removing him, and like I said, he was being passively
     resistant, he was being verbal, but he was not showing - he
     was not clenching his fists or showing that he was gonna
     become resistive in any manner, at that point."  [Def. Ex. A
     at 04; Doc. #81 at 128-29].

42.  Powell was assisted out of the chair by Figiela and Heller,
     who held plaintiff in a wrist elbow escort hold, one officer
     on each side of plaintiff. [Doc. #81 at 135-36; Def. Ex. A
     at 04, 08, 18, 20].

43.  Linares stated that Powell's behavior was interfering with
     the orderly operation of the intake unit. "The officers that
     were in that area had to stop doing what they were doing to
     come and escort Mr. Powell out of there." [Doc. #81 at 135].

44.  Linares testified, "I didn't want the incident to escalate.
     I didn't want the other inmates to hear what was going on
     and have them start going off in the bullpen, believing that

10

something was happening to inmate Powell, or something like that." [Doc. #81 at 150].

45. This was a routine escort, and it was conducted pursuant to normal institutional procedure, in accordance with standard escort techniques taught at the DOC training academy. [Doc. #81 at 136; Def. Ex. A at 8-9].

46. Upon arrival in the segregation foyer, plaintiff began passively resisting the escort, refusing to move his own feet, and actively struggling to escape the grasp of the officers. [Doc. #81 at 139; Def. Ex. A at 04, 07-10, 12-13, 16, 18, 20].

47. Plaintiff was ordered to face the wall, and he began to vigorously resist the officer's escort, struggling to get free. [Doc. #81 at 139-140].

48. Linares testified that Powell began to push away or pull away, "attempting to move and release himself from the officer's escort, and moving his head. He was attempting to turn his face and pull away from the officer's escort." [Doc. #81 at 141-42].

49. Lt. Linares instructed the correctional officers to escort Mr. Powell to the prone position, and Powell was guided down by Figiela and Heller, who had his upper extremities; Peterson, who maintained control of the upper torso, and Siwicki, who maintained control of plaintiff's lower torso. [Doc. #81 at 142-146; Def. Ex. A at 8-9, 16, 17, 18, 20, 21].

11

50.   Linares explained, "What I mean by directing him to the prone position, means that the officers still have control of the inmate, and they basically bring him down to the prone without causing themselves or the inmate injury.  They still have control of the inmate, they have a hold of his elbow and wrist still, and they are directing him down towards the ground.  They're not dropping him or throwing him." [Doc. #81 at 142-43].

51.   In response to the question, "The reports use the phrase, 'escort to the prone,' Isn't that just a nice way of saying that you're slamming him down to the ground?," Linares responded, "He was not slammed down, sir.  He was directed, and escorted is basically the officers have control of what's going on and they're bringing the inmate down, attempting not to have harm caused either to them or the inmate." [Doc. #81 at 143].

52.   Plaintiff was escorted to the prone position "to maintain control of the inmate and for safety reasons, the safety of the staff and also the safety of the inmate."  [Doc. #81 at 146].

53.   Capt. Cusimano testified that he arrived on the scene after Powell was in the prone position being controlled by staff. [Doc. #81 at 4].

54.   Cusimano directed Officer Heller to retrieve the video camcorder.  This instruction was made subsequent to the use of force and prior to Powell having his hair extensions

12

removed. [Doc. #81 at 4, Def. Ex. A at 8].

55. Cusimano explained, "[a]fter responding to the area, and he - force was already utilized. There was no predicting what kind of behavior that the inmate might conduct or display, you know, from that time on, so a video camera was retrieved." [Doc. #81 at 6].

56. Cusimano testified that the video was operating continuously until Powell was secured in his cell and Cusimano directed Heller to stop taping. [Doc. #81 at 7; Def. Ex. J].

57. The Court finds that plaintiff failed to produce any credible evidence that defendant Linares, and the other defendants involved in the escort, acted for any other motive other than to maintain safety, control and order at Walker on November 24, 1998. [Doc. #81 at 145-46; Def. Ex. A; Def. Ex. B, 01, 06; Def. Ex. J].

58. Cusimano testified that he did not observe any facial injuries to plaintiff. [Doc. #81 at 5; Def. Ex. C].

59. Officer DeRota testified that when he arrived, Powell was in the prone position. He stated that no officer was beating or punching Powell. He observed Powell being lifted and assisted to a chair. At no time did Powell complain of an injury in DeRota's presence. DeRota testified he remained in the area during the videotaping while Powell's braids were cut off. [Doc. #80 at 165-168].

60. Powell's head did not hit the wall or the floor and there was no evidence or objective findings of any bruises. [Pl.

13

Ex. B at 01, 06; Doc. #81 at 5; Def. Ex. A, C; Doc. #81 at 141, 143, 147-48].

61. Powell stipulated at trial that he made no complaints of any on going injuries arising from this incident from March 1999 onward. [Doc. #80 at 146]

62. The Court also finds that the defendants acted to restore control, order and safety, and that the number of officers involved in the incident was reasonably necessary to maintain control and safely escort plaintiff to the prone position. [Doc. #81 at 43-50].

63. The Department of Correction's Directive 6.5 authorizes the use of force to protect a person from an immediate threat. [Def. Ex. N at 03, ¶5.A]. Force is defined as "[p]hysical contact or contact through use of an armory item by a staff member in a confrontational situation to establish control or restore order." [Def. Ex. N. At 02, ¶3(C)].

64. The Court finds that defendants escorted plaintiff to the prone because they reasonably believed that plaintiff posed an immediate threat to Correction Officers Heller and Figiela, when plaintiff was struggling to get his arms free from the escort.

65. The defendants reasonably believed that they were authorized to use force under the circumstances of this case.

66. A supervisor, Lt. Linares, was on the scene, and sufficient staff were in place to assure the safety of plaintiff when escorted to the prone position. [Doc. #81 at 43-49, 140-48].

14

67.  Sufficient staff were present so that chemical agents did not have to be used. [Doc. #81 at 44].

68.  The only force used was the reasonable application of a hand hold (wrist-elbow) escort position and the escort of plaintiff to the prone position.  These are standard security procedures taught in the DOC training academy, and provided for by DOC directives and policies.

69.  Plaintiff was not escorted to the prone until after he began resisting the escort, twisting his body and head, and attempting to pull his hands away when he was asked to face the wall, after his hands were placed on the wall outside segregation. [Doc. #81 at 140-48, Def. Ex. A at 8].

70.  Capt. Cusimano explained that, "[f]rom viewing an inmate on the floor and there was an altercation with staff, you need - the administrative directive requires that we video all use of force." [Doc. #80 at 232].

71.  Cusimano testified, "[u]se of force is physical contact with an inmate as a result of a confrontational situation in which we need to maintain control and restore order to an area." [Doc. #80 at 233].

72.  Cusimano opined that he did not consider this incident a planned use of force.  "The inmate was being escorted to RHU. When the escort commenced, although he might a been, you know, objecting to verbal instruction, he was not physically resistive at the time." [Doc. #80 at 234].

73.  Cusimano testified that "the officers were escorting the

15

inmate to [the Restricted Housing Unit] for failing to comply with instructions, and he became hostile, and was taken to the prone. So, I wouldn't consider . . . [seven officers] an excessive amount of officers to control a situation, no." [Doc. #80 at 224].

74. The Court finds that the use of force was necessary, and was reasonably related to legitimate penological objectives [Doc. #81 at 43-49, 140-48], to maintain safety for the staff and plaintiff as well, and to maintain order in the Walker facility. [Def. Ex. A, J].

<u>Removal of the Hair Extensions</u>

75. Powell was placed in a chair in the segregation foyer, and Nurse Carlon was summoned to cut out Powell's artificial hair braids. [Def. Ex. A at 05, 06; Def. Ex. J].

76. Captain Cusimano testified that, from the time plaintiff was seated in the chair, he was compliant and remained compliant during the process of removing the hair extensions. [Doc. #80 at 235, Def. Ex. J].

77. Officer DeRota filed a disciplinary report on Powell for possession of contraband. [Doc. #80 at 179]. He testified that inmates can hide materials such as razor blades or handcuff keys in braids. Braids can be tied together and used to hang oneself or to strangle another inmate. [Doc. #80 at 179].

78. DeRota's "Use of Force" report states that he "observed" Nurse Carlon remove the contraband braids but did not use

16

any force on Powell. [Def. Ex. A at 14].

79. Officer Heller testified that hair extensions present a danger as their removal can alter an inmate's appearance. "It's possible they can be woven together, could have a piece of rope, strangle someone, tie someone up with it." [Doc. #80 at 24].

80. Heller agreed with the statement "that individuals who have fake hair extensions, whether they are gay, straight, bi, transsexual, are ordered to remove those hair extensions." [Doc. #80 at 39].

81. Captain Cusimano testified that it would not be sound correctional practice to permit Powell to enter the restrictive housing unit (RHU) with hair braids. "I would not be able to thoroughly inspect those on his head.  I mean, I don't know what he could actually be hiding in the hair braids, what actually he would put - conceal in the hair braids possibly a razor. . . I imagine, it could be tied together, fashioned into some type of rope or, you know, there is numerous things that inmates think of to do with contraband . . . ." [Doc. #81 at 21].

82. The removal of plaintiff's artificial hair extensions was undertaken solely for legitimate penological reasons related to preventing escape, and protecting inmate and facility safety.

83. Nurse Carlon carefully separated the braids, and gently cut them with medical trauma shears. [Def. Ex. J; Doc. #81 at

17

15].

84.  Thomasena Vaughn, plaintiff's hairdresser, testified that it
     would take approximately six and a half (6.5) hours to
     remove the braids manually without a comb, if you were able
     to snip the ends off first.  With a comb, she estimated it
     would take "anywhere from two and a half (2.5) to three (3)
     hours" to remove the braids. [Doc. #81 at 99].

85.  Ms. Vaughn testified that the synthetic material of the
     braids is very strong. She estimated that each braid was
     approximately fourteen inches (14") in length and there were
     about seventy (70) to eighty (80) braids on Powell's head.
     She testified it was possible to connect the braids with the
     right technique. [Doc. #81 at 105-06].

86.  Lt. Linares testified,

          If Mr. Powell would have requested the comb,
          we would have given him ample time and placed
          him in a single cell, and staff had other
          duties to tend to besides this, so yes, he
          would have been given time.
          .  .  .  .  .

          He could've been put in a single cell by
          himself and he could have removed the
          extensions while staff took care of other
          duties that they had, like the AP officers,
          they would've been around that area and they
          could've kept looking in on him.
          .  .  .  .

          It would have saved the whole incident.

          [Doc. #81 at 122].

87.  Nurse Carlon testified that she lifted the braids to cut
     them, which enabled her to observe Powell's skull. She
     stated that she observed no "golf sized" lumps. [Doc. #81 at

18

88].

88. Contrary to Powell's statement [Def. Ex. X], the video [Def. Ex. J], and the photograph of plaintiff's head [Def. Ex. C] clearly demonstrate that plaintiff had no bald spots, but rather was left with approximately two (2) inches of natural hair. [Doc. #81 at 14].

89. The Court finds Powell's allegation that he was left with numerous bald patches completely unsubstantiated. [Def. Ex. C, J; Doc. #81 at 15].

90. Roll Call Notice dated June 1, 1998, clearly states that contact lenses are not listed on the property matrix and inmates are not permitted to possess them. "Any contact lens which are encountered during [the] course of cell shakedowns should be treated as contraband and confiscated." [Def. Ex. T].

91. Powell's testimony is contradicted by the video in several material respects, including Powell's claim that he was first ordered to remove his contact lenses, and second, given a hair cut. [Doc. #80 at 102; Def. Ex. X; Def. Ex. J].

92. Powell's claim during the video that, without contact lenses, "he couldn't see a thing without them," is squarely contradicted by plaintiff's medical record which shows 20/20 in Powell's left eye and 20/40(-)(1) in Powell's right eye. [Def. Ex. B at 09, Doc. #80 at 123].

93. The video contradicts Powell's claim that Nurse Carlon roughly grabbed and pulled plaintiff's hair and cut it at

the base of his scalp. [Def. Ex. X; Def. Ex. J].

94.  In the video, Mr. Powell is seated calmly in the chair. He does not appear to have just been brutally beaten by four correction officers. [Def. Ex. J]. He is not breathing heavily nor is he stating for the video camera, as he alleged, that he is being treated unjustly because of his sexual orientation. [Def. Ex. X; Def. Ex. J; Doc. #80 at 102, 119].

95.  Officer DeRota and Captain Cusimano testified they did not hear plaintiff complain about pain and did not observe any head injury to plaintiff.  [Doc. #80 at 170; Doc. #81 at 15, 25].

96.  Plaintiff received a hair cut a few days after the braids were removed. [Doc. #80 at 81; Pl. Ex. 13].

97.  Plaintiff testified at trial that he "never watched that video. To this day, I still have not watched the video. I don't want to watch it." [Doc. #80 at 120].

Homophobic Epithets/Remarks

98.  Administrative Directive on standards of conduct 2.17(5)(B)(10) "strictly prohibit[s]" DOC employees from engaging in "abusive or obscene language, threats and/or intimidating behavior." [Def. Ex. M at 3].

99.  Powell's claim that he was the subject of numerous vulgar homophobic epithets, allegedly captured on video while plaintiff was strip searched, is not supported by the evidence. [Compare Def. Ex. J, with Doc. #80 at 11, 119].

20

100. Nurse Carlon testified that she did not perceive Powell to
     be a transsexual, homosexual or as having a gender identity
     disorder. [Doc. #81 at 73-74].  She did not perceive Powell
     to be wearing a woman's hairstyle. [Doc. #82 at 75].

101. Lt. Linares testified that he did not perceive Powell to be
     grooming himself like a woman. "We have inmates with long
     hair in the facility. I mean, how he carried his hair or how
     he was wearing his hair really didn't mean anything to me at
     that point." [Doc. #81 at 114].

102. Linares testified that he did not hear the correctional
     officers direct vulgar, profane or otherwise homophobic
     remarks in his presence. [Doc. #81 at 149].  He stated that
     other inmates react to that type of staff conduct. "If they
     hear what you're saying, they will tell on you and they will
     join in." [Doc. #81 at 151].  "It's always inmates versus
     staff in a situation like that." Id.

103. Officer DeRota testified that he did not recall anyone
     speaking "vulgar, homophobic remarks" in his presence. [Doc.
     #80 at 168-69].

104. Capt. Cusimano testified he did not observe any of the
     correctional officers direct any vulgar homophobic remarks
     towards Powell. [Doc. #81 at 14-17].

105. Officer Heller testified that he did not see Figiela
     threaten Powell or hear him direct a stream of slurs,
     insults, or derogatory statements at Powell. [Doc. #80 at
     40-41].

106. Heller testified that individuals with fake hair extensions, whether they're gay, straight, bi, or transsexual, are ordered to remove those hair extensions. [Doc. #80 at 39].

107. Lt. Linares testified that he did not hear Officer Figiela direct any vulgar homophobic remarks towards Powell. [Doc. #81 at 132-33].

108. The Court does not find that the defendants made homophobic or unprofessional remarks to plaintiff.  The Court finds, based on the evidence, that defendants acted in a professional manner, within the scope of their employment. Plaintiff was strip searched in a routine, professional manner in accordance with DOC policy. [Def. Ex. O, A.D. 6.7; Def. Ex. J].

109. There was no evidence that plaintiff was treated in a discriminatory manner simply because he was a homosexual.

110. There is no credible evidence of any discrimination against plaintiff because he is homosexual.

Strip Search

111. Administrative Directive 6.7(5)(D) provides that an inmate strip and visual body cavity search will be conducted "[u]pon initial placement in a restrictive housing, protective custody or close custody unit."[Def. Ex. O].

112. Captain Cusimano ended the video taping when Powell was secured in a cell "pending medical attention to the inmate, at that point, the camera was reintroduced to the cell to videotape . . . the medical examination of inmate Powell in

the cell." [Doc. #81 at 25].

113. Cusimano testified that he observed no serious injury to Powell during the strip search. Powell was able to lift his feet and spread his toes, with no visible swelling or difficulty disrobing. [Doc. #81 at 35-36, 40-41; Def. Ex. C].

Medical/Mental Health Treatment

114. Nurse Carlon was a licensed and practicing nurse for forty-five (45) years, and was also certified as an Emergency Medical Technician (EMT). [Doc. #81 at 86].

115. After plaintiff was escorted to segregation cell S-09, he was examined by Nurse Carlon in a matter of minutes. [Doc. #80 at 100].

116. Nurse Carlon performed a complete head to toe examination of plaintiff. [Def. Ex. B; Def. Ex. J; Doc. #81 at 82].

117. She testified that she did not recommend any treatment on the medical form after the examination "because there was no treatment needed," "no injuries, no symptoms." [Doc. #81 at 82-83]. Nurse Carlon testified that she examined Powell's skull with her hands and felt no "golf ball" sized lumps. [Doc. #81 at 89].

118. Nurse Carlon found no bruises on plaintiff and so indicated in her medical incident report and medical chart note. [Def. Ex. B at 01, 06; Doc. #81 at 87, 89].

119. Plaintiff was seen by medical and/or mental health staff on November 24, 25, 27 and 30, and twice on December 1, 1998,

once by Dr. Heller. Plaintiff was seen by mental health staff on December 2, 9, 10 and 21, 1998. [Def. Ex. B at 01-06; Def. Ex. H at 33-36, 92-95, 328; Def. Ex. K at 272-74, 280, 283-84, 287, 290, 293-94, 296; Doc. #80 at 96, 103, 111, 148-153, 180].

120. On November 30, 1998 plaintiff was given routine blood laboratory work, as part of his intake physical, including a urine sample. [Def. Ex. H at 92-95; Doc. #80 at 148-151].

121. Officer DeRota testified that a unit lieutenant tours segregation a couple of times a shift. [Doc. #80 at 185]. For example, on November 25, 1998, Lt. Linares toured segregation at 3:54 p.m. and 6:08 p.m. [Def. Ex. K at 275]. On November 27, 1998, Deputy Warden Chewinski and Complex Warden Huckabee toured the unit at 12:45 p.m. and Linares toured at 4:03 p.m. [Doc. #80 at 185-87; Def. Ex. K at 283-84]. At no time did inmate Powell register a complaint.

122. There is no documentation anywhere in plaintiff's medical chart which corroborates plaintiff's claim of injury. [Def. Ex. H; Def. Ex. B at 10-06].

123. Powell's assertion at trial that he was suicidal is completely contradicted by the contemporaneous notes taken by mental heath staff, which state unequivocally that plaintiff was not suicidal. [Pl. Ex. 27 at 3; Def. Ex. H 33-36; 328-330; Def. Ex. B at 04, 05; Doc. #80 at 97].

124. C.O. DeRota testified that plaintiff never notified him that he was suicidal or needed to be placed on suicide watch.

[Doc. #80 at 180].

125. Powell testified that he received satisfactory mental health care and met with mental health treaters fairly regularly. [Doc. #80 at 95-96, 110; Def. Ex. B at 04-05; Def. Ex. H 33-36].

126. There was no evidence offered at trial that Nurse Carlon had any duties or responsibility for providing plaintiff with treatment for an alleged "gender identity disorder." [Doc. #81 at 73].

127. The only evidence at trial as to Nurse Carlon's duties was that she was assigned to perform intake medical interviews and intake physical examinations, as well as respond when needed to segregation, for example, for medication administration or upon being summoned by the unit officer. [Def. Ex. K at 17 (log p. 287); Def. Ex. B at 6; Def. Ex. A at 25; Doc. #81 at 76-77, 79, 93].

128. The logbook pages document prompt responses by medical and mental health staff, who responded to segregation when called by the segregation officers. [Def. Ex. K; Doc. #80 at 100].

129. Plaintiff had no visible injuries and all examinations were within normal limits. [Def. Ex. H; Def. Ex. B at 10-06].


DISCUSSION

   Plaintiff alleges that defendants violated his constitutional rights under the Fourth, Eighth and Fourteenth

Amendments to the United States Constitution and Sections One, Seven, and Nine of Article First of Connecticut's Constitution. At trial plaintiff's testimony was uncorroborated by any other witnesses on the key issues of this lawsuit. The question before the Court is whether plaintiff has sustained his burden of proof on these claims. The Court concludes that he has not and finds in favor of the defendants on all counts.

A.    Fourth Amendment Privacy Rights and
      Fourteenth Amendment Substantive Due Process Clause

Plaintiff contends that "defendants exceeded their authority" by executing a routine strip search in a "humiliating manner" in the presence of the assaulting officers and "intentionally and needlessly cutting off the plaintiff's hair extensions," and a portion of plaintiff's natural hair, instead of permitting Powell to remove the extensions himself. [Doc. #74 at 18].  Plaintiff contends these actions violated his Fourth and Fourteenth Amendment rights to be free from unreasonable searches.

Administrative Directive 6.7(5)(D) provides that an inmate strip and visual body cavity search will be conducted "[u]pon initial placement in a restrictive housing, protective custody or close custody unit." [Def. Ex. O].  Plaintiff contends that a strip search "undertaken in a non-routine and/or harassing manner may offend the Fourth Amendment as 'the searches must be conducted in a reasonable manner.'" [Doc. #74 at 19 citing Bell v. Wolfish, 441 U.S. 520, 560 (1979)].

26

To assess whether Powell has proven a violation of his Fourth and Fourteenth Amendment rights, the Court must "determine whether the search in question was reasonable under the Fourth Amendment." Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992) (citation omitted).

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979). It is clearly established in this Circuit that inmates retain a limited right to bodily privacy under the Fourth Amendment. Covino, 967 F.2d at 78.

The Court's second inquiry is whether prison officials had sufficient justification to intrude on Powell's Fourth Amendment rights. Id. In Washington v. Harper, the Supreme Court stated that

> the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is reasonably related to legitimate penological interests. This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review . . . . [This standard applies] in all cases in which a prisoner asserts that a prison regulation violates the Constitution . . . . We made quite clear that the standard of

27

> review we adopted in Turner applies to all
> circumstances in which the needs of prison
> administration implicate constitutional
> rights.

494 U.S. 210, 223-24 (1990) (citations and internal quotation

marks omitted).

In Turner v. Safley, 482 U.S. 78 (1987), the Supreme Court

listed four factors governing the review of prison regulations:

> (i) whether there is a valid, rational
> connection between the prison regulation and
> the legitimate governmental interest put
> forward to justify it; (ii) whether there are
> alternative means of exercising the right in
> question that remain open to prison inmates;
> (iii) whether accommodation of the asserted
> constitutional right will have an
> unreasonable impact upon guards and other
> inmates, and upon the allocation of prison
> resources generally; and (iv) whether there
> are reasonable alternatives available to the
> prison authorities.

Covino, 967 F.2d at 78-79 (citing Turner, 494 U.S. at 89-90).

"The burden is upon the prisoner to show that a challenged prison

regulation is unreasonable." Covino, 967 F.2d at 79 (citing

Fromer v. Scully, 874 F.2d 69, 74 (2d Cir. 1989)).

Plaintiff has not challenged the reasonableness of the DOC's

Administrative Directive 6.7(5)(D) requiring that a strip and

visual body cavity search be conducted "[u]pon initial placement

in a restrictive housing, protective custody or close custody

unit strip searches prior to admission to restrictive housing."

Rather, plaintiff argues that a "non-routine and/or harassing

manner" violates the Fourth Amendment and such "searches must be

conducted in a reasonable manner." [Doc. #75 at 18].   He argues

that "an unnecessary number of persons present would violate the

inmate's rights to privacy." Id.

This Court does not find these arguments persuasive.  The Court finds that the DOC's Administrative Directive 6.7(5)(D) is reasonable on its face. Absent any challenge to the Directive from the plaintiff, the Court declines to undertake further analysis of the directive under the four prongs articulated in Turner.

After carefully reviewing the videotape and trial transcripts and weighing the credibility of the witnesses, the Court finds that the strip search of plaintiff was reasonably conducted.  Addressing plaintiff's other arguments, the Court finds no credible evidence that the search was "accompanied by verbal abuse." [Doc. #74 at 18]. The Court does not find the number of officers present during the strip search excessive in light of plaintiff's prior resistance to the escort to segregation.  The officers were on hand after the escort, throughout the removal of the hair extensions and through the strip search, up to the placement of plaintiff in his cell in restrictive housing.

Similarly, plaintiff fails to challenge the reasonableness of the DOC's policy classifying artificial hair extensions as contraband.  Rather, plaintiff argues that the intentional and needless removal of plaintiff's hair extensions and a portion of plaintiff's natural hair was a violation of the Fourth Amendment, arguing that he should have been allowed to remove the braids himself. [Doc. #74 at 18].   The Court finds that the policy

29

classifying artificial hair extensions as contraband and requiring the removal of the artificial hair extensions is reasonable under the DOC's duty to maintain safety and security. Pell v. Procunier, 417 U.S. 817, 826-27 (1974).  Absent any challenge to the policy from the plaintiff, the Court declines to undertake further analysis.

According, the Court finds in favor of defendants on plaintiff's claim that defendants violated his Fourth and Fourteenth Amendment rights to be free from unreasonable searches.

B.   Eighth Amendment

1.   Deliberate Indifference to Serious Medical Need

The Court finds no credible evidence of deliberate indifference to serious medical or mental health needs of the plaintiff.[5]

The defendants argue that there is no factual basis for the plaintiff's claim of deliberate indifference to a serious medical need. Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. See  Estelle v. Gamble, 429

---

[5]Post-trial, plaintiff has abandoned his claim of deliberate indifference to serious mental health needs, stating "the plaintiff clearly and repeatedly asked for both physical and mental health care, but received the latter only." [Doc. #75 at 22].  Indeed, Powell testified that he received satisfactory mental health care and met with mental health treaters fairly regularly. [Doc. #80 at 95-96, 110; Def. Ex. B at 04-05; Def. Ex. H 33-36].

U.S. 97, 104 (1976). To prevail on such a claim, however, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. See Id. at 104-05. Mere negligence will not support a §1983 claim; the conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)).

There are both subjective and objective components to the deliberate indifference standard. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert. denied sub nom., Foote v. Hathaway, 513 U.S. 1154 (1995). The alleged deprivation must be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991); see Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) ("'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain"); see, e.g., Neitzke v. Williams, 490 U.S. at 319 (1989) (brain tumor); Hathaway v. Coughlin, 841 F.2d 48 (2d Cir. 1988) (broken pins in hip); Williams v. Vincent, 508 F.2d 541 (2d Cir. 1974) (doctor discarded inmate's ear and stitched stump rather than attempting to reattach ear); Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970) (prison doctor refused to follow surgeon's instructions and

31

refused to give prescribed painkiller to inmate), cert. denied, 401 U.S. 983 (1971). Not all medical conditions, however, satisfy this component of the standard. See, e.g., Jones v. Lewis, 874 F.2d 1125 (6th Cir. 1989) (mild concussion and broken jaw), cert. denied, 506 U.S. 841 (1992); Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988) (kidney stone); Hanton v. Grotta, No. 3:97CV93, 2000 WL 303428 (D. Conn. Feb. 11, 2000) (back and neck pain, denial of bottom bunk); Malsh v. Austin, 901 F. Supp. 757 (S.D.N.Y. 1995) (delay in providing routine dental treatment); Glasper v. Wilson, 559 F. Supp. 13 (W.D.N.Y. 1982) ("bowel problems").

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." Hathaway, 37 F.3d at 66 (citing Wilson, 501 U.S. at 298). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)); Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000)).

> A difference of opinion between a prisoner
> and prison officials regarding medical
> treatment does not, as a matter of law,
> constitute deliberate indifference.   Chance

32

v. Armstrong, 143 F.3d 698, 703 (2d Cir.
1998); United States ex rel. Hyde v.
McGinnis, 429 F.2d 864, 867 (2d Cir. 1970)
(citing Coppinger v. Townsend, 398 F.2d 392,
394 (10th Cir. 1968)); McCloud v. Delaney,
677 F. Supp. 230, 232 (S.D.N.Y. 1988)
("[t]here is no right to the medical
treatment of one's choice..."). Nor does the
fact that an inmate might prefer an
alternative treatment, or feels that he did
not get the level of medical attention he
preferred. Dean v. Coughlin, 804 F.2d 207,
215 (2d Cir. 1986). As long as the medical
care is adequate, there is no Eighth
Amendment violation. Wandell v. Koenigsmann,
No. Civ.A. 99-8652, 2000 WL 1036030, at *3
(S.D.N.Y. July 27, 2000).

Indeed, prison officials and medical officers
have wide discretion in treating prisoners,
and Section 1983 is not designed to permit
federal courts to interfere in the ordinary
medical practices of state prisons. Church
v. Hegstrom, 416 F.2d 449, 450-451 (2d Cir.
1969). Federal courts are generally hesitant
to second guess medical judgments and to
constitutionalize claims which sound in state
tort law. Dean v. Coughlin, 804 F.2d 207,
215 (2d Cir. 1986) ("The Constitution does
not command that inmates be given medical
attention that judges would wish to have for
themselves.") So strong is this view that
determinations of medical providers
concerning the care and safety of patients
are given a "presumption of correctness."
Perez v. The County of Westchester, 83 F.
Supp.2d 435, 440 (S.D.N.Y. 2000) (citing
Kulak v. City of New York, 88 F.3d 63, 77 (2d
Cir. 1996)).

Sonds v. St. Barnabas Hospital Correctional Health Services, 151

F. Supp. 2d 303, 311 (S.D.N.Y. 2001).

Plaintiff claims that his Eighth Amendment rights were

violated by defendants' failure to provide him with prompt

medical care and that his "complaints of serious symptoms such as

coughing up blood and severe head pain were nominally examined,

then ascribed to anything other than the most logical cause-i.e. the assault that he had just undergone." [Doc. #74 at 22].

There is no objective medical evidence that the denial of overall medical care for plaintiff's knee and head complaints or vomiting rose to the level of deliberate indifference.  The record clearly demonstrates that plaintiff was not denied medical attention for his complaints.  Rather, the medical records and evidence demonstrate that plaintiff was examined by Nurse Carlon within a matter of minutes after arriving in the restricted housing unit. [Doc. #80 at 100; Def. Ex. B; Def. Ex. J; Doc. #81 at 82].  Nurse Carlon testified she did not recommend any treatment on the medical record after the examination "because there was no treatment needed," "no symptoms," and "no injuries." [Doc. #81 at 82-83].  She found no bruises and felt no "golf ball" sized lumps on plaintiff's skull. [Doc. #82 at 87, 89; Def. Ex. B at 01, 06].

Plaintiff clearly believes that his medical care has been inadequate.  However, "differences of opinion between a prisoner and prison officials concerning the appropriate course of treatment for the prisoner's medical condition do not rise to the level of an Eighth Amendment violation." Edmonds, 2002 WL 368446, at 8  (citing Chance v. Armstrong 143 F.3d 698, 703 (2d Cir. 1998); see Estelle, 429 U.S. at 107 (the "question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or

34

like measures, does not represent cruel and unusual punishment.
At most it is medical malpractice, . . .").

Plaintiff was seen by medical and/or mental health staff on
November 24, 25, 27 and 30 and twice on December 1, 1998, once by
Dr. Heller.  Plaintiff was seen by mental health staff on
December 2, 9, 10, and 21, 1998. [Def. Ex. B at 01-06; Def. Ex. H
at 33-36, 92-95, 328; Def. Ex. K at 272-74, 280, 283-84, 287,
290, 293-94, 296; Doc. #80 at 96, 103, 111, 148-153, 180].
Medical notations of November 25 indicate that plaintiff "stated
[he] vomited blood. No specimen to detect blood in vomitus.
Specimen cup issued. [Inmate] stated I had 'red juice [with]
breakfast.'" "[Inmate] placed temporarily on clear liquid diet."
On November 27, Powell requested to be taken off the liquid diet
stating "he ha[d] not vomited since 11/25/98."   [Def. Ex. B at
06-07]. On November 30, 1998 plaintiff was given routine blood
laboratory work, as part of his intake physical, including a
urine sample. [Def. Ex. H at 92-95; Doc. #80 at 148-151].

The objective medical evidence documented in plaintiff's
medical chart fails to corroborate plaintiff's claim of injury.
[Def. Ex. H; Def. Ex. B at 10-06].  The logbook documents prompt
responses by medical and mental health staff, who responded to
segregation when called by the segregation officers. [Def. Ex. K;
Doc. #80 at 100].  Plaintiff had no visible injuries and all
examinations were within normal limits. [Def. Ex. H; Def. Ex. B
at 10-06].

It is clear from other cases that have considered inmate

35

complaints of denial or delay of medical treatment that
plaintiff's complaints of knee and head pain and vomiting do not
constitute a "serious medical need." Estelle, 429 U.S. at 106;
see Nance, 912 F.2d at 607 (Pratt, J., dissenting) (discussing
cases which have met the "serious medical needs" requirement).
Powell was examined by Nurse Carlon within minutes of being
secured in his cell in segregation. No medical evidence
corroborates plaintiff's claim that he was coughing up blood. The
medical records indicate he was seen on the day of his complaint,
he was treated with a liquid diet, and there was a follow-up
entry a day and a half later. Plaintiff's requests for medical
examination were responded to in a timely manner. Nance, 912
F.2d at 607. Plaintiff's disagreement with his diagnosis and
medical treatment, on this record, does not constitute deliberate
indifference to a serious medical need and does not constitute
cruel and unusual punishment.

Finally, there was no evidence offered at trial that Nurse
Carlon had any duty or responsibility to provide plaintiff with
treatment for an alleged "gender identity disorder." [Doc. #81 at
73]. The only evidence at trial as to Nurse Carlon's duties was
that she was assigned to perform intake medical interviews and
intake physical examinations, as well as respond when needed to
segregation, for example for medication administration or upon
being summoned by the unit officer. [Def. Ex. K at 17 (log p.
287); Def. Ex. B at 6; Def. Ex. A at 25; Doc. #81 at 76-77, 79,
93]. Indeed, there is no evidence in the medical record that

36

plaintiff identified himself as having "gender identity disorder" or that defendants were on notice of this condition. Plaintiff seems to argue that this condition of "gender identity disorder" was self evident because of plaintiff's long hair extensions and disclosure that he has slept with other men. The Court does not find this argument persuasive. Accordingly, the Court need not address plaintiff's further argument that "gender identity disorder" is a medical condition that would have permitted plaintiff to keep his artificial hair extensions.

The Court finds in favor of defendants on plaintiff's Eighth Amendment claims that defendants were deliberately indifferent to plaintiff's serious medical or mental health needs.

2. <u>Excessive Force</u>

The excessive force plaintiff complains of is the unauthorized cutting of plaintiff's artificial hair extensions. Plaintiff first argues that he did not refuse to obey an order to remove his hair extensions, he did not "alarm or threaten anybody" and thus there was "never sufficient justification for the use of force." [Doc. #74 at 23-24]. He contends that the hair extensions never posed any threat to security. <u>Id.</u> at 24-25. Finally, plaintiff argues that, by removing his artificial hair, defendants "exceeded their authority by acting in the *absence* of a regulation, as opposed to any claim that the very enforcement of a regulation violates a constitutional right." [Doc. #74 at 26-27 (emphasis in original)]. Powell contends he "was simply the victim of discriminatory treatment that had nothing to do

37

with the penological purposes asserted by the defendants' counsel
for trial purposes." Id. at 27.

    a.   Hair Extensions

    It is well established that evaluation of penological
objectives is committed to the considered judgment of prison
administrators, "who are actually charged with and trained in the
running of the particular institution under examination." Bell
v. Wolfish, 441 U.S. 520, 562 (1979); See Turner v. Safley, 482
U.S. at 86-87. Clearly prison inmates "do not forfeit all
constitutional protections by reason of their conviction and
confinement in prison," Bell v. Wolfish, 441 U.S. at 545;
"federal courts must take cognizance of the valid constitutional
claims of prison inmates." Turner, 482 U.S. at 84. Valid
constitutional claims include actions based on an inmate's free
exercise rights under the First Amendment. See Pell v. Procunier,
417 U.S. 817, 822 (1974). Inmates who have challenged prison
regulations prohibiting facial hair and/or hair length have done
so arguing infringement of their First Amendment free exercise
rights. See Friedman v. Arizona, 912 F.3d 328, 329-30 (9th Cir.
1990) (prison policy preventing Orthodox Jewish prisoners from
growing beards did not unconstitutionally restrict the prisoner's
free exercise rights); Fromer v. Scully, 874 F.2d 69 (2d Cir.
1989) (prison regulation which prohibited inmates from wearing
beards longer than one inch in length did not violate the free
exercise rights of an Orthodox Jew); Iron Eyes v. Henry. 907 F.2d
810 (8th Cir. 1990) (short hair prison regulation did not

unconstitutionally infringe upon a Native American's First Amendment right to freely exercise his religious beliefs).

Plaintiff contends that the taking of his hair extensions was an improper use of force under the Eighth Amendment. [Doc. #74 at 23 (emphasis added)]. He asserts that he had a right to wear his artificial hair extensions in the absence of an administrative directive. Id. at 26-27. However, he does not assert a constitutional right to wear his artificial hair extensions. "[T]he inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute." Bell v. Wolfish, 441 U.S. at 562. Without the assertion of a constitutional violation, this Court defers to the judgment of the prison officials that artificial hair extensions posed a potential safety threat to the institution and are not permitted. [Doc. #80 at 24, 179; Doc. #81 at 21, 105-06]. Plaintiff was subjected to generally applicable, neutral rules governing the prohibition of contraband, which apply to wigs and other facial disguises, including artificial hair extensions. The prison officials were authorized to remove contraband, such as contact lenses [Def. Ex. T] and artificial hair extensions, to preserve security. [Def. Ex. Q (A.D. 6.10 contraband)]. The Court credits the testimony and evidence that plaintiff refused several orders from the officers, Lieutenant Linares and Captain Cusimano, to remove his contact lenses and hair extensions. The Court does not find credible plaintiff's

39

testimony that he asked for a comb and/or time to remove the braids on his own.  "The 'normal activity' to which a prison is committed--the involuntary confinement and isolation of large numbers of people, some of whom have demonstrated a capacity for violence--necessarily requires that considerable attention be devoted to the maintenance of security."  Pell v. Procunier, 417 U.S. 817, 826-27 (1974).  Powell simply has not met his heavy burden of showing that these officials exaggerated their response to the genuine security considerations that triggered the chain of events at issue in this lawsuit. Bell v. Wolfish, 441 U.S. at 561-62.  This Court must, therefore, defer to the legitimate penological interests of the prison to maintain safety.

    b.   Escort to Segregation

    When an inmate claims that excessive force has been used against him by a prison official, he has the burden of establishing both an objective and subjective component to his claim.  See Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993) "The objective component relates to the seriousness of the injury; however, 'the use of excessive force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'"  Davidson v. Flynn, 32 F.3d 27, 29 (2d Cir. 1994) (quoting Hudson v. McMillian, 503 U.S. 1, 8-9 (1992)).  This component is "contextual and responsive to 'contemporary standards of decency.'"  Hudson, 503 U.S. at 2 (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  The subjective component requires the inmate to show that the prison

officials acted wantonly.  With regard to an excessive force claim, the inmate must show that the prison officials acted "maliciously and sadistically to cause harm . . . ."  Id. at 7.

"An inmate's constitutional protection against excessive force 'is nowhere nearly so extensive as that afforded by the common law tort action for battery.'"  Hunt v. Budd, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (quoting Johnson v. Glick, 481 F.2d 1028 (1973)).  What constitutes such conduct varies according to the nature and circumstances of the alleged constitutional violation. Whitley v. Albers, 475 U.S. 312, 320 (1986). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " Id. at 320-21 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973)). "Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." Hudson v. McMillian, 503 U.S. 1 (1992) (citation omitted). Prison administrators are, therefore, "'accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" Id. (citation omitted). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."

41

Id. "That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 1000. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."   Johnson, 481 F.2d at 1033.

"The Eighth Amendment prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind'" Hudson, 112 S.Ct. at 1000 (quoting Whitley, 475 U.S. at 327).

Plaintiff asserts that during the escort to segregation, he suffered  bruises, injury to his head and an injured knee. Plaintiff's medical records raise questions concerning the credibility of plaintiff's allegations. In fact, a medical examination conducted within minutes of the alleged assault revealed no bruise, no swelling, no redness, no pain, and no other indication of physical injury. Nurse Carlon's examination determined that plaintiff was "uncooperative and belligerent" and refused to remove his artificial hair extensions and contacts. [Def. Ex. A at 25; Def. Ex. B at 06].  The Court also credits the officers' testimony and incident reports that, when they were called to the interview room by Nurse Carlon, plaintiff continued to refuse the request to remove his artificial hair extensions and contacts. [Def. Ex. A at 04 (Linares), 08 (Heller), 09 (Peterson), 10 (Siwicki)]. In their entirety, plaintiff's medical records lead to the conclusion that plaintiff did not suffer

significant pain, bruising or injury when examined by Nurse
Carlon and that he has since exaggerated his condition.  When
officials use force maliciously and sadistically to cause harm,
the Eighth Amendment is violated "whether or not significant
injury is evident." Hudson, 112 S.Ct. at 1000. No evidence of
malicious purpose or sadism has been presented to the Court; no
such intent may be logically implied from the evidence.

The Court, therefore, finds in favor of defendants on
plaintiff's Eighth Amendment claims.


C.    Fourteenth Amendment: Equal Protection Clause

Plaintiff, as a transsexual male, asserts gender based
discrimination under the Equal Protection Clause of the
Fourteenth Amendment.  He argues that the Court should apply an
intermediate level of scrutiny to his gender based discrimination
claim.

The Fourteenth Amendment to the United States Constitution
guarantees that "[n]o state shall ... deny to any person within
its jurisdiction the equal protection of the laws." This means
the state must treat similarly situated individuals similarly, in
the absence of an adequate reason to distinguish between them.
"The Fourteenth Amendment's promise that no person shall be
denied the equal protection of the laws must coexist with the
practical necessity that most legislation classifies for one
purpose or another, with resulting disadvantage to various groups
or persons." Romer v. Evans, 517 U.S. 620, 632 (1996)(citations

43

omitted). The Supreme Court has "attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." Id. (citing Heller v. Doe, 509 U.S. 312, 319-320 (1993).

"As a general rule, the equal protection guarantee of the Constitution is satisfied when the government differentiates between persons for a reason that bears a rational relationship to an appropriate governmental interest." Able v. U.S., 155 F.3d 628, 622 (2d Cir. 1998).  This Circuit has not recognized homosexuals as a suspect class, see Id., 155 F.3d at 632 (declining to decide the question of what scrutiny to apply to discrimination on the basis of homosexuality), other Circuits have not recognized homosexuals as a suspect class and have applied a rational basis test.  See Romer v. Evans, 517 U.S. 620, 634-35 (1996) (applying rational basis analysis), see also Stemler v. City of Florence, 126 F.3d 856, 874 (6th Cir. 1997) (same), Schroeder v. Hamilton School Dist., 282 F.3d 946, 957 (7th Cir. 2002) ("Homosexuals have not been accorded the constitutional status of blacks or women."), Reichenberg v. Perry, 97 F.3d 256, 260-61 (8th Cir. 1996), cert. denied, 522 U.S. 807 (1997); Thomasson v. Perry, 80 F.3d 915, 928 (4th Cir.), cert. denied, 519 U.S. 948 (1996).

The prohibition of contraband hair extensions and contact lenses does not single out any class or group of inmates and is

44

neutral on its face.  Plaintiff argues that "inmates who arrive
at Walker wearing unauthorized items, such as clothing, surrender
them to an officer in a dignified manner and without suffering
any disciplinary repercussions." [Doc. #74 at 19].  Plaintiff
contends that the defendants who "demanded immediate removal" of
his "hair by scissors had already exceeded their authority and
were no longer acting in the interests of safety; they were
instead exercising their personal prejudices regarding gender."
Id. at 20. However, there is no evidence that plaintiff was
singled out or treated differently than any other inmate with
hair extensions. The evidence demonstrates that the defendants'
prohibition on contraband hair extensions and contact lenses was
a generally applicable security procedure that was uniformly
applied to all inmates.

Indeed, there is insufficient evidence to show that
plaintiff identified himself as a transsexual to Nurse Carlon or
the other defendants. [Doc. #81 at 73-74]. Indeed, Nurse Carlon
testified that she did not perceive Powell to be a transsexual,
homosexual or as having a gender identity disorder.  Id.   She
did not perceive Powell to be wearing a woman's hairstyle.  Id.
There is no evidence demonstrating that the defendants perceived
plaintiff to be a transsexual and there is no reference in the
medical files that he was a transsexual. Lieutenant Linares
testified he did not perceive Powell to be grooming himself like
a woman.  "We have inmates with long hair in the facility.  I
mean, how he carried his hair or how he was wearing his hair

45

really didn't mean anything to me at that point." [Doc. #81 at
114]. The video shows plaintiff was not dressed in women's
clothing, rather, he was dressed in DOC issued clothing.
Plaintiff has failed to prove that defendants were on notice that
he was a transsexual or that he was perceived by defendants to be
a transsexual.

Accordingly, the Court finds in favor of the defendants on
plaintiff's Equal Protection claim under the Fourteenth
Amendment.


D.    Connecticut Constitutional Claims

      1. Article First, Section One: Equal Protection Clause

      Plaintiff's claims under Article First, Section One of the
Connecticut Constitution, which guarantees equality of rights for
all, also fail.  Plaintiff argues that the "evidence produced at
trial showed that the defendants harassed and punished the
plaintiff more harshly than other inmates because they perceived
him to be a homosexual and/or transsexual person, and this
harassment by as state official constitutes a violation of
Section One." [Doc. #74 at 30].

      Even applying "strict scrutiny," as plaintiff argues, his
claims are unsupported. As set forth above, under either the
traditional 'rational basis' test, or the more stringent 'strict
scrutiny' test, there is insufficient evidence to support
plaintiff's  claim of discrimination on the basis of his sexual
orientation.

Accordingly, the Court finds in favor of defendants on the equal protection claim under Article First, Section One of the Connecticut Constitution.

2. <u>Article First, Section Seven: Search and Seizure</u>

Plaintiff also brings a claim under Article First, Section Seven of the Connecticut Constitution, which protects individuals from unreasonable search and seizure. Plaintiff argues that the state constitution offers greater protections then the Fourteenth Amendment to the United States Constitution. He argues that "defendants' seizure of the plaintiff's hair was unconstitutional." [Doc. #74 at 31]. No Connecticut case law was cited to support this proposition that would persuade this Court to apply a stricter standard in the context of a prison than under the Fourth Amendment to the United States Constitution.

Accordingly, judgment will enter for the defendants on plaintiff's claim under Article One, Section Seven of the Connecticut Constitution for the reasons stated by the Court under the Fourth Amendment.

3. <u>Article First, Section Nine: Excessive Force</u>

Similarly, plaintiff argues that Article First, Section Nine of the Connecticut Constitution "differs significantly" from the Eighth and Fourteenth Amendments to the United States Constitution. [Doc. #74 at 31-32]. Plaintiff argues, among other things, that defendants' actions were unauthorized under DOC policy and "[s]uch unauthorized punishments violates Section 9, inasmuch as the right of privacy over matters such as one's hair

47

are constitutionally protectable."  [Doc. #74 at 31].  He

contends that "defendants punished the plaintiff in ways not

clearly warranted by law . . . [t]hese punishments were

extraordinary and excessive . . . ."  Id. at 32.  Plaintiff

offers no case law to support this proposition that would

persuade this Court to apply a stricter standard in the context

of a prison than under the Eighth Amendment to the United States

Constitution.

Accordingly, judgment will enter for the defendants on

plaintiff's claim under Article One, Section Nine of the

Connecticut Constitution for the reasons stated by the Court

under the Eighth Amendment.


E.    Connecticut Statutory Claim: Conn. Gen. Stat. §52-571c

Plaintiff seeks treble damages under Conn. Gen. Stat. §52-

571c[6] for acts he contends constituted a violation of §53a-181k.[7]

---

[6]Section 52-571c(a), Action for damages resulting from
intimidation based on bigotry or bias, provides that

> (a) A person injured or property as a result
> of an act that constitutes a violation of . .
> . §53a-181k . . . may bring a civil action
> against the person who committed such act to
> recover damages for such injury.

[7]Section 53a-181k(a), Intimidation based on bigotry or bias
in the second degree: Class D felony, provides that

> (a) A person is guilty of intimidation based
> on bigotry or bias in the second degree when
> such person maliciously, and with specific
> intent to intimidate or harass another person
> because of the actual or perceived race,
> religion, ethnicity or sexual orientation of
> such another person does any of the

48

Based on the findings of facts and conclusions of law, this Court cannot find "malicious[ness]" or "specific intent" necessary under Section 53a-181k(a) to warrant a damages award under Section 52-571c. Accordingly, judgment must enter in favor of defendants on this claim.


CONCLUSION

Based on the foregoing, the Court finds for defendants on all counts.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. #13] on August 1 and 6, 2001, with appeal to the Court of Appeals.

ENTERED at Bridgeport this 23rd day of July 2004.


___/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

following: (1) Causes physical contact with such other person, (2) damages, destroys or defaces any real or personal property of such other person, or (3) threatens, by work or act, to do an act described in subdivision (1) or (2) of this subsection, if there is reasonable cause to believe that an act described in subdivision (1) or (2) or this subsection will occur.

49